Rieck-McJunkin Dairy Company, Appellant, *v.*
Milk Control Commission of Pennsylvania.

Argued October 2, 1940; reargued January 9, 1941.
Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN,
PATTERSON and PARKER, JJ.

*Charles K. Robinson,* of *Dickie, Robinson & McCamey,* with him *Willis F. Daniels,* for appellant.

*Frank E. Coho,* Deputy Attorney General, with him *Claude T. Reno,* Attorney General, for appellee.

*A. Evans Kephart,* for intervenor.

*E. Lowry Humes,* for intervenor.

OPINION BY MR. JUSTICE STERN, March 24, 1941:

In form this appeal is an attack on the validity of General Order No. A-45 of the Milk Control. Commission, but in substance its challenge is directed to the constitutionality of the proviso contained in section 803 of the Milk Control Law of April 28, 1937, P. L. 417. That section provides that "The commission shall fix, by official order, the minimum prices to be paid by milk dealers to producers for milk: Provided, however, that the fixing of prices to be paid by milk dealers to producers for milk to be used solely in manufacturing shall be discretionary with the commission."

General Order No. A-45, promulgated by the Commission, after a public hearing, on October 23, 1939, approved by the Governor November 15, 1939, and effective December 1, 1939, established a "Pittsburgh Milk Marketing Area," classified milk into seven classes as permitted by section 804 of the act, and prescribed minimum prices in that area to be paid to producers for milk in each class. These classes embraced milk for human consumption in fluid form and milk utilized in the manufacture of butter, chocolate, candy, cheese, ice cream and other dairy products. Rieck-McJunkin Dairy Company, a Pennsylvania corporation with its principal

place of business in Pittsburgh, purchases milk from producers for utilization in several, if not all, of the classes. It appealed from the order of the Commission to the Dauphin County Court, not on the ground that the prices established by the order were unfair or in themselves subject to criticism, but that the Commission had no legal power to fix the prices of milk to be used solely in manufacturing.

The constitutionality of the grant to the Commission of the general power to fix minimum and maximum wholesale and retail prices of milk was sustained in two pronouncements of this court: *Rohrer v. Milk Control Board*, 322 Pa. 257, 186 A. 336; and *Colteryahn Sanitary Dairy v. Milk Control Commission*, 332 Pa. 15, 1 A. 2d 775. The question now raised is in regard to the legality of the *discretionary* power vested in the Commission to regulate the prices of milk used in manufacturing. The reason why the exercise of that power was made discretionary instead of mandatory becomes evident from even a cursory study of the manner in which the milk industry is conducted. Milk to be used for drinking can travel, because of its ephemeral life, only within a restricted area, but manufactured milk products, owing to their less perishable nature, can be, and are, imported into Pennsylvania from other states where milk is sold at a lower cost than that at which it can be produced here. The result is that the prices of milk absorbed into manufacturing processes must face the competition of low-cost production areas which may be located far away, and, because of the necessity of meeting such competitive conditions, it is practically impossible to establish a price of milk used in manufacturing that would pay the cost of production in Pennsylvania. The majority of dealers use milk both for resale in fluid form and for manufacturing, and, under the so-called "utilization" system which is commonly employed, the total price received by the producer for milk delivered to the dealer is determined at periodic

intervals when the latter reports the different uses to which the milk has been devoted; a "blended" price is thus obtained, made up in part of the higher price of the milk resold as fluid and in part of the lower prices of that used in the manufacture of various dairy products. The main purpose of the Milk Control Law being to insure a sufficient supply of wholesome milk, which cannot be accomplished unless, as the preamble of the act recites, "the high cost of maintaining sanitary conditions of production and standards of purity is returned to the producers of milk," it is obvious that, under ordinary conditions, the proper minimum price that producers should receive will depend not only upon the amount obtained for fluid milk used directly for human consumption but also upon the portion of the blended price derived from the lower rate for the milk used in manufacturing.[1] If the Commission were not given the power to fix minimum prices of milk for manufacturing purposes, there would be a tendency for the prices of such milk to be so depressed by the competition which characterizes the sale of the manufactured products that the total price received by the producers might fall to a point where they would not be able to furnish the pure milk necessary for the maintenance of public health and which it is the object of the Milk Control Law to secure. On the other hand, it would not always be necessary for the Commission to exercise that power. Circumstances and conditions in particular areas might conceivably be such that, at times, the prices of milk for manufacturing would exert no substantial influence upon the market as a whole, and consequently the Commission might find that the fixing of minimum

---

[1] The validity of the "utilization" system, embodying a blended price, as opposed to the theory of "segregation" of the various classes of milk, for the purpose of determining a fair return, was upheld in *Colteryahn Sanitary Dairy v. Milk Control Commission*, 332 Pa. 15, 27-30, 1 A. 2d 775, 781-783. Cf. *United States v. Rock Royal Co-operative*, 307 U. S. 533.

prices for milk so used would not be needed to fulfill the major purpose of the Milk Control Law. There might occasionally be places where all the milk produced would be marketed only for resale in fluid form, or where certain types of milk would be used for making products the prices of which would have no effect upon the price of milk generally. Then again, notwithstanding the play of competitive forces, the market prices of the milk used for manufacturing might not become so drastically lowered as to interfere to any great degree with the total or blended price received by the producers, in which case no regulatory action on the part of the Commission would be required. For such and, no doubt, other reasons, the legislature, appreciating the fact that the situation demanded a flexible control, deemed it wise to leave to the Commission the duty of investigating conditions to ascertain whether, and to what extent, the prices of milk for manufacturing purposes affected, in any given area, those prevailing in the milk market as a whole, and, in accordance with the findings made, to exercise, or to refrain from exercising, the power to fix the prices of such milk in order to accomplish the object for which the Milk Control Law was designed.

It is not a novelty in legislation for power to be given to a body other than the legislature itself to determine facts upon which should depend whether, and when, a law was to become effective, or for authority to be granted to such a body to act, or to withhold action, depending upon a factual ascertainment of conditions, in order to carry out the legislative intent in conformity with the principles laid down in the law itself. In *Baldwin Township's Annexation*, 305 Pa. 490, 158 A. 272, an act was sustained which provided that in a proceeding for the annexation of part of a township to a contiguous city there must first be obtained the approval of the state council of education. The court there said (p. 496): "If the grant of authority is not a delegation of power to make a law but merely investing some of-

ficial or group of electors with discretion in putting the law into effect in a certain situation, it can as constitutionally be granted to the state council of education as it can be to the electors of the district affected. . . . There are many analogies to this in our system of laws." A quotation from *Tranter v. Allegheny County Authority,* 316 Pa. 65, 76, 173 A. 289, 294, is also in point: "It is first said that the statute violates Article II, section 1, vesting legislative power in the General Assembly; that, by empowering the county commissioners to take the steps necessary to obtain the charter for Allegheny County Authority, legislative power was delegated. The legislature has made the law permitting organization of the corporation in certain circumstances. No power to make the law was delegated to the county commissioners; all that remained for them to do was to find a fact from which they should determine whether to act or not, i. e., whether it was desirable to take advantage of the law in accord with its provisions. If they decided in the affirmative, it was then necessary to comply with the statute to bring the corporation into existence."

The milk control laws in some of the states invest the boards or commissions which they establish with the power to determine whether certain conditions exist in different marketing areas, and, upon so finding, to designate such areas, define their boundaries, and fix prices that would accomplish the purpose of the act. Such a provision in the Oregon law was held valid in *Savage v. Martin,* 161 Ore. 660, 696-699, 91 P. 2d 273, 288; in the California law in *Jersey Maid Milk Products Co. v. Brock,* 13 Cal. 2d 620, 641-644, 91 P. 2d 577, 589, 590; in the Virginia law in *Highland Farms Dairy v. Agnew,* 16 Fed. Supp. 575, 581, 582; and in the Vermont law in *State v. Auclair,* 110 Vt. 147, 4 A. 2d 107, 115.

There are cases in the United States Supreme Court which illustrate the same principle. In *Field v. Clark,* 143 U. S. 649, an act was upheld which conferred au-

thority upon the President to suspend by proclamation, for such time as he should deem just, the provisions relating to the free introduction into the United States of certain articles, when he was satisfied that the country exporting such articles imposed upon products of the United States duties which he might deem to be reciprocally unequal and unreasonable. In *Hampton & Co. v. United States,* 276 U. S. 394, an act was sustained which provided that whenever the President found, upon investigation, that the duties which it fixed did not equalize the differences in cost of production in the United States and the principal competing country, he should determine and proclaim increases or decreases in the rates of duty necessary to effect such equalization. The court pointed out that all that was thereby conferred upon the President was a discretion as to the execution of the law to be exercised under and in pursuance of its terms, and that (p. 407) "Congress may feel itself unable conveniently to determine exactly when its exercise of the legislative power should become effective, because dependent on future conditions, and it may leave the determination of such time to the decision of an Executive, or, as often happens in matters of state legislation, it may be left to a popular vote of the residents of a district to be affected by the legislation." In *United States v. Rock Royal Co-operative,* 307 U. S. 533, the Agricultural Marketing Agreement Act of 1937 was held to be constitutional; it gave the Secretary of Agriculture power to issue an order fixing minimum prices to be paid by dealers for each classification of milk, whenever he found, after hearing, that the issuance of such an order would tend to effectuate the declared policy of the act.

If the exercise of the discretion given to the Milk Control Commission were left to the arbitrary will and uncontrolled judgment of the Commission, the proviso of section 803 would undoubtedly constitute an invalid delegation of legislative power. In fact, however, it

was obviously intended that this discretionary power should be hedged about by the same purposes and standards as those governing the mandatory fixing of minimum prices with respect to other milk, and which were held in the *Rohrer* and *Colteryahn* cases to be sufficiently definite. The contingency upon which the Commission is to act in fixing the prices of milk to be used in manufacturing is inherent in the whole organic scheme and structure of the act and in the policy announced in its preamble. To use the piquant phrase of Justice CARDOZO in *Panama Refining Co. v. Ryan,* 293 U. S. 388, 440, the discretion given to the Commission "is not unconfined and vagrant. It is canalized within banks that keep it from overflowing."

It is earnestly urged by appellant that it is impossible for the Commission to exercise the power of fixing prices for milk used in manufacturing because section 801 of the act provides that the Commission should "base all prices upon all conditions affecting the milk industry in each milk marketing area, including the amount necessary to yield a reasonable return to the producer and to the milk dealer," but, since the prices of dairy products manufactured and sold by a dealer are controlled by competitive markets and the Commission has no power under the act to regulate them, the Commission cannot insure a reasonable return to such a dealer. While, however, it is true that the Commission cannot fix the prices of the manufactured products, it can, and presumably does, take the currently prevailing market prices of such products into consideration in determining whether the dealer will receive a reasonable return under the prices fixed by the Commission for the milk purchased by him. In order to produce a desired mathematical result it is not necessary to have control of more than one variable factor in the process by which the result is produced. Appellant does not complain that the prices fixed in Order No. A-45 do not in fact assure to it a reasonable return, nor is

162

it shown that a scale of prices cannot ordinarily be established which, under prevailing conditions, would afford a reasonable return to both the dealer who manufactures dairy products and the producer who sells him the milk for that purpose.

We cannot refrain from noting that even if appellant were to succeed in its attempt to have the proviso of section 803 of the act declared unconstitutional, its success would be wholly illusory, since the deletion of the proviso would leave in force the body of the section making *mandatory* the fixing of minimum prices to be paid by dealers to producers for all milk, irrespective of the use to which it may be put. Whether or not one part of a statute can survive the excision of another part which has been held invalid is a question of statutory construction, and in determining it the court searches for the intention of the legislature.[2] In the present instance the legislature has *expressed* its intention, because section 1201 of the act states: "It is hereby declared to be the legislative intent that if this act cannot take effect in its entirety because of the decision of any court holding unconstitutional any part, *sentence or clause* hereof, the remaining provisions of the act shall be given full force and effect as completely as if the part held unconstitutional had not been included herein. It is hereby declared as the intent of the Legislature that every other part, *sentence or clause* of this act would have been enacted had such unconstitutional provision not been included herein." (Italics supplied.) While such an expression of legislative intent is not always conclusive, ordinarily it is but little short of a mandate. Even in the absence of a statutory declaration, it has never been considered a barrier to the application of the principle of severability that the valid and invalid provisions are contained in the same

---

[2] Cf. Statutory Construction Act of May 28, 1937, P. L. 1019, section 55.

paragraph or section of the act, the only question being whether or not they are essentially and inseparably connected in substance: *Rothermel v. Meyerle,* 136 Pa. 250, 265, 20 A. 583, 587, 588; *Commonwealth v. Great American Indemnity Co.,* 312 Pa. 183, 197, 167 A. 793, 798, 799; *Rutenberg v. Philadelphia,* 329 Pa. 26, 39, 196 A. 73, 79; and there are abundant authorities holding that unconstitutional exceptions to a general provision may be eliminated without thereby invalidating the principal enactment,—for example, *Bagley Co. v. Cameron,* 282 Pa. 84, 127 A. 311; *Blauner's, Inc., v. Philadelphia,* 330 Pa. 342, 198 A. 889; *Butcher v. Philadelphia,* 333 Pa. 497, 6 A. 2d 298.

Realizing the dilemma thus confronting it, appellant seeks refuge in the contention that the provision of section 803 (which would thus remain in force even if the proviso were invalidated) that the Commission shall fix the minimum prices to be paid by dealers to producers for milk, refers only to milk as defined in section 103, a definition which, appellant claims, does not include milk used for manufacturing purposes. This is a patent misconception of the scope of that definition. Section 103 declares that " 'Milk' includes fluid milk" generally, there being no limitation expressed as to the purpose—whether for human consumption directly or for manufacturing—for which the fluid milk is to be used. The case relied upon by appellant in this connection, *State Board of Milk Control v. Richman Ice Cream Co.,* 117 N. J. Eq. 296, 175 A. 796, is clearly inapposite, because the New Jersey Milk Act defines milk as "the natural product of a dairy animal or animals, and includes such product when cooled, pasteurized, condensed or concentrated . . . with a view to being sold as milk and also cream, buttermilk and skimmed milk, sold or intended to be sold as such for human food; such term excludes the natural product of a dairy animal or animals sold or intended. to be sold for any other purpose," thus restricting "milk" to milk sold as such for human

consumption, and showing a legislative intent to exclude milk used for manufacturing purposes.

Order dismissing appeal affirmed, at cost of appellant.