## Rau v. Milk Control Commission

*Willis Daniels* and *Stanley J. Fehr*, for appellant.

*Henry Sheppard*, Deputy Attorney General, and *George F. Coffin*, for Milk Control Commission.

FRACK, J., July 15, 1946.—This matter is before us on an appeal by John F. Rau, trading as Rau's Dairy, from a decision and order of the Milk Control Commission of the Commonwealth of Pennsylvania, revoking his milk dealer's licenses for the license years 1941-1942, 1942-1943, 1943-1944, and suspending his right to apply for a license for the year 1944-1945. The commission originally issued a citation, which was subsequently amended, directed to licensee and to his surety on his milk dealer's bond to show cause why it should not revoke or suspend his licenses for making underpayments to 19 milk producers from whom he purchased milk during the period from August 1, 1940, to June 30, 1941, because he had failed to account and to make payments for milk in accordance with official general orders of the Milk Control Commission. After hearings held, the commission found that the licensee had underpaid said producers during said period in the total sum of $4,132.21 and fixed the specific amount due to each producer by reason of the underpayments made. From the commission's findings

and orders of revocation and of suspension, appellant appealed and assigned numerous reasons in support of the appeal. By stipulation, the appeal in all respects has been discontinued excepting on the single question stated to be "Does the Milk Control Law of the Commonwealth of Pennsylvania of April 28, 1937, P. L. 417, prohibit a milk dealer from placing milk, produced by his own herd, in class 1?"

Appellant is engaged in the business of producing, distributing and selling milk and milk products. Milk produced by his own herd is in excess of his need for his sales of raw and grade A milk. The surplus of milk produced by himself, not sold as raw and grade A milk, along with milk purchased from producers other than himself is distributed and sold by this dealer to consumers as grade B milk and milk products. During the 11-month period covered by this citation, appellant marketed as grade B milk products 517,226 pounds of milk produced by his own herd and 1,509,391 pounds of milk purchased from other producers. All grade B milk was utilized in three classes: (1) as grade B, class 1 milk; (2) as grade B, class 1-A milk; and (3) as grade B, class 3 milk. Under the official general orders of the Milk Control Commission, milk utilized as grade B, class 1 milk with a four percent butterfat content during the period of time in question must be bought from the producer at a minimum price of $2.70 per hundredweight; grade B, class 1-A, with the same butterfat content had a minimum price payable to producers of $2 per hundredweight during the months of June, July and August, and $2.20 per hundredweight during the remaining months of the year; and the minimum price payable by a dealer to a producer for milk utilized in manufacturing as grade B, class 3 is $1.15 per hundredweight where the butterfat content is four percent. The first two classes are used in fluid form, have an ephemeral life and can travel only within a restricted area. Manufactured milk

products can be and are imported into Pennsylvania from other States which are competitively low cost production areas. Where a milk dealer uses milk both for resale in fluid form and for manufacturing, the producer receives a minimum blended price for his milk, dependent upon what percentage of his milk was utilized on distribution in either or all of said classes. The blended price thus obtained, made up in part of the higher price of the milk resold as fluid and in part of the lower prices of milk used in the manufacture of various dairy products is higher in direct proportion as milk of the producer is utilized in the higher price classes.

Official General Order B-1, sec. 11, of the Milk Control Commission provides, inter alia, as follows:

"Method of Determining Payment to Producers. Dealers shall be responsible to producers for payment on a weight and butterfat basis and as determined by the utilization of the aggregate of milk received at each plant or receiving station during the period covered by the payment . . ."

The commission found that appellant underpaid producers with respect to grade B, class 1-A, and grade B, class 3 products in a total sum of $414.29 because the proper minimum prices were not paid. $3,717.92 of the alleged underpayment to producers from whom appellant bought milk arises by reason of the fact that this producer-milk dealer places milk produced by himself in a preferred status for utilization purposes, as compared to milk purchased from other producers, in that he places the surplus milk, not used as raw or grade A milk, produced by his own herd 100 percent in grade B, class 1, when he computes the amounts due to producers for milk supplied by them. After preferring himself, the remainder of the grade B milk sold and distributed by him as fluid milk and milk products he classifies on a utilization basis equal for all such remaining producers whose milk also had become a part of the entire pool of grade B milk. The

witness Hautz testified: "In my examination of the records I found two sets of utilization every month on Mr. Rau's records, and when I asked Mr. Rau what they represented, he said 'The one is the actual utilization and the other is the one I pay on' ". For the month of August 1940 it was testified that the actual utilization of all milk marketed among consumers as grade B milk and milk products was 70.29 percent in class 1; 11.94 percent in class 1-A and 17.77 percent in class 3. After taking 100 percent credit for milk contributed by himself to the pool of grade B milk, appellant paid the other producers from whom he purchased milk on the basis that 48 percent of their milk instead of 70.29 percent was utilized in class 1, with differences also as to class 1-A and class 3, to the detriment of producers other than appellant. For the month of August 1940 on the basis of actual utilization, according to the commission, the producers other than appellant should have received $3,101.47 instead of $2,739.04 actually paid to them, so that there would be an underpayment to them of $362.43 for the month. For the other months there is a parallel situation with the result that on this phase of the case the commission alleges an underpayment of $3,717.92 to producers other than appellant for the period of time involved in this proceeding.

Appellant's written brief points out that the statement of the sole question stipulated to be decided by us on this appeal is "admittedly somewhat confusing". To clarify the question before us, appellant says in his written brief that with reference to milk contributed by him to the grade B pool of milk marketed by him the sole question is "whether a producer-dealer is permitted to classify all the milk produced by his own herd in the highest classification, and to distribute the classification of the remainder of the milk sold by him among the producers from whom he purchases milk, giving to each producer the same percentage of

each classification of milk sold to the public". Appellant joins legal issue with the commission when it asserts that one occupying the dual position of milk dealer and producer must treat milk from his own herd in the same way as he treats milk from other producers, without preference or discrimination and that he may not place all milk produced by his own herd in the utilization class commanding the highest price, so as to reduce the percentage of utilization of milk in the class commanding the highest price which is received from other producers.

Appellant in the written brief states that prior to the enactment of the Milk Control Law in Pennsylvania "the dealer or a producer-dealer could purchase milk from a dozen different producers and pay each producer a different price so long as he and the producer had a meeting of minds. He could have used all his milk in the higher classifications and he could have used another given producer's milk in a higher classification and all of the other producers' milk in a lower classification. . . . We admit that since the enactment of the statute and the promulgation of the orders of the Commission under the statute, he must give the same percentage of each classification to each of the producers from whom he purchases milk, but if the statute prevents the dealer from utilizing his own milk in the highest classification before computing the utilization as to the milk purchased, the language of the statute should plainly set this out".

Appellant urges that under a proper construction of the statute that he is not subject to the control of the Milk Control Commission with reference to milk produced by himself, and that he has a right to use all milk produced by him in a utilization class commanding the highest price even though such use results in a reduction in that utilization percentage for other producers' milk which would exist if all milk utilized by appellant were treated in the same way without

preference or discrimination. He further urges that the legislature has not stated with clarity that there has been a modification of his common-law rights and that his right has been taken away from him to use his milk in a manner preferential to himself and in discrimination against other producers whose milk is also the same basic product usable for the same utilization and distributed from the same point or plant as appellant's milk.

Appellant's contention that in his dual capacity as milk dealer and producer he may treat milk from his own herd in a preferred position and may place all the milk produced by himself in the utilization class commanding the highest price, thereby reducing the percentage of milk received from other producers which is utilized in that class to the detriment of the other producers has been decided adversely to appellant in McGarvey v. Milk Control Commission, 26 Erie County Law Journal 114, and in Grow etc. v. Milk Control Commission, 52 D. & C. 225. It is urged that these decisions are not binding on us. It is stated that our decision must be based on the Milk Control Act of April 28, 1937, P. L. 417, and that the latter two cases construe the act as amended by the Act of July 24, 1941, P. L. 443, so that they should be no precedent for us. It should be noted, however, that the case of Grow v. Milk Control Commission deals with a violation occurring prior to the passage of said amendment to the Milk Control Act; nor does a comparison of the language pertinent and material to the question before us persuade us that there is any merit to the argument based on difference in language of the act prior to and subsequent to the amendment. The changes in language caused by the amendment are not on matters which control our problem.

Appellant alleges that on a proper construction of the Act of 1937 he is not subject to the control of the Milk Control Board with reference to milk produced

by himself. The act always has provided a " 'producer' means a person producing milk": section 103. The same section defines a milk dealer as any person "who purchases or handles milk within the commonwealth for sale, shipment, storage, processing or manufacturing within or without the commonwealth. A producer who delivers milk to a milk dealer only shall not be deemed a milk dealer. . . ." The operator of a dairy farm who sells milk produced by his own herd at retail directly to consumers is a "milk dealer" within the meaning of the Milk Control Act (construing the 1935 act with similar provision as 1937 act) and may not, therefore, operate without securing a license. Such producer-distributor is intended by the legislature to be subject to the regulations imposed upon every "milk dealer": Milk Control Board v. Stafford etc., 29 D. & C. 506 (Hirt, P. J.). Appellant therefore is a milk dealer subject to the regulations imposed upon every milk dealer not only for milk purchased from other producers but for milk produced by his own herd, all of which becomes one pool of grade B milk utilized in three classes of milk products, all being distributed from a single plant or point in sales to consumers.

The Milk Control Law which regulates the milk industry by requiring dealers to be licensed by a board created under its provisions, prohibiting those not so licensed from dealing in milk and milk products, and giving said board the right to fix the minimum prices to be paid the producers and the minimum and maximum prices to be charged the consumer, is constitutional, even though it is in derogation of common-law rights: Rohrer v. Milk Control Board, 322 Pa. 257; Colteryahn Sanitary Dairy v. Milk Control Commission of Pennsylvania, 332 Pa. 15, 20. While such a law subjects a person and his property to restraints and burdens, the question of public health is one of first importance; and a law enacted for the protection of the public health, where not so arbitrary as to be

unnecessarily destructive of individual property rights, is upheld by the courts: 22 Am. Jur. 808, Food, sec. 7.

"Neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest. . . . The court has repeatedly sustained curtailment of enjoyment of private property, in the public interest. The owner's rights may be subordinated to the needs of other private owners whose pursuits are vital to the paramount interests of the community . . .": Rohrer v. Milk Control Board, supra, 266, 267.

In construing the Milk Control Act of 1937 we are asked to restrict our construction to conform to certain section headings. We, however, may not do so. Section 103 of the act provides: "Article or section headings shall not be construed to affect in any manner the scope or meaning of any article or section of this act". The true rule is that a statute must be construed as a whole to determine the intention of the legislature. In construing a statute, the court must consider the necessity of the law, the prevailing mischief to be remedied and the object to be obtained. The intention of the legislature is to be taken or presumed to be according to what is consonant to sound reason and discretion: Grime et al. v. Department of Public Instruction et al., 324 Pa. 371. Certain words, apart from the content of the act, are emphasized by appellant with suggestions that they have certain meanings. We must bear in mind, however, the rule that to determine the real meaning of a word in an act, a broad and general view of the act must be taken, so as to get exact conception of its aim, scope and object:

Penn Dairies Inc. v. Milk Control Commission, 344 Pa. 635, affirmed 318 U. S. 261.

Licensing and price-fixing have a direct and substantial relation to sanitation, public health and public welfare: Rohrer v. Milk Control Board, supra. The Pennsylvania statute creating a Milk Control Board to regulate the milk industry and to fix minimum prices to be paid by dealers, and requiring dealers to obtain licenses and keep certain records, manifests intent to reach a domestic situation in the interests of the welfare of producers and consumers in the State: Milk Control Board of Pennsylvania v. Eisenberg Farm Products, 306 U. S. 346 (Act of 1935, P. L. 96).

The economic justification for not permitting appellant to utilize milk produced by himself in a manner which is preferential and detrimental to other producers is fully explained by the following excerpt from Rohrer v. Milk Control Board, supra, in the language of Judge Keller, at page 265:

"The milk industry is not only absolutely vital to the health and well-being of the whole people, and especially growing children, but it is also unique and in a class by itself because (1) milk cannot be kept by the producer, but must be delivered to the dealer within twenty-four hours of production; (2) the supply must exceed the demand by a reasonable margin in order to provide for emergencies, and this excess over the normal demand be put to less profitable uses and consequently paid for at a smaller price; (3) the method of payment is based on how it is utilized by the dealer, who reports to the producer the uses made of it; (4) it must be handled with the utmost care from start to finish and is hedged about by a host of sanitary regulations, for the protection of the public, because it is a most fertile field for the growth of bacteria. These facts make the dairy farmer or producer dependent for his return on the use to which

the dealer to whom he delivers it puts it. His commodity and the price he receives for it are so far out of his control that, as a matter of fact, his supposed freedom of contract is largely illusory and at the mercy of the dealer unless the legislature intervenes for his protection; not primarily for his benefit, but only secondarily or incidental to the main purpose of promoting the public welfare by seeing to it that an adequate supply of pure milk is available at a price reasonable to the public, the dealer and the producer."

The Milk Control Law was enacted for the purpose of regulating and controlling the milk industry in this Commonwealth (section 101) and with a view to preserve an essential industry and to protect a most necessary and essential human food supply. The Milk Control Law is designed to insure a sufficient supply of pure wholesome milk which cannot be accomplished unless the high cost of maintaining sanitary conditions of production and standards of purity is returned to the producers of milk. It is apparent that in order to carry out the purpose of the law the price-fixing must extend to all sales of milk by both producers and dealers: Penn Dairies v. Milk Control Commission, supra; see also preamble to the 1937 Milk Control Act.

The purpose of the Milk Control Law primarily is to assure the consuming public of sufficient milk at all times. Continuous production of milk is to be assured by fixing minimum prices to be paid producers for milk. Section 801 of the 1937 act provides that the Milk Control Commission "shall ascertain and maintain such prices for milk in the respective milk marketing areas as will be most beneficial to the public interest, best protect the milk industry of the commonwealth and insure a sufficient quantity of pure and wholesome milk to inhabitants of the commonwealth, having special regard to the health and welfare of children . . .", and in fixing prices "the Commission

shall base all prices upon all conditions affecting the milk industry in each milk marketing area, including the amount necessary to yield a reasonable return to the producer and to the milk dealer".

Recognizing that an adequate supply of good milk at all times is dependent upon the ability of those engaged in the industry to continue to carry on their business and to carry it on in such a way that the needs of the consumers may be met and that in turn this ability depends in part upon a reasonable profit being returned to those engaged in the industry, the Milk Control Law was enacted, designed in part to assure that the supply of good milk will not be diminished by reason of those engaged in the industry being forced out of business through financial loss. The language of section 801 contemplates that the producer and the dealer shall receive a price that will not only compensate him for his reasonable operating expenses but will permit a fair return on his investment; and in ascertaining what the just price should be, the commission should not select the most efficient or the least efficient producers or dealers in the area under consideration, upon whose figures of investments and costs to conclude what a fair return should be, but it should endeavor to utilize a cross-section representative of the average of the normally efficient producers or dealers in the district, and in reaching prices to be paid producers should not segregate the different grades or classes of milk and have each stand on its own base: Colteryahn Sanitary Dairy v. Milk Control Commission, supra.

Section 803 provides that "the Commission shall fix by Official Order the minimum prices to be paid by milk dealers to producers for milk. . . ." This is to effectuate the primary purpose of the 1937 act to assure the consuming public of sufficient milk at all times; by the act the legislature expressed its belief

that continuous production of milk is assured by fixing minimum prices to be paid producers for milk.

"Pursuant to section 804, the legislature has granted authority to the Commission to classify milk. Sale by the producers on the utilization plan has been the custom in numerous areas for a period of many years before the present laws were adopted. The producer delivers the whole milk to the dealer and is paid on the basis of its actual utilization in the various classifications. While the dealer keeps a record of the utilization of the milk, the producer never knows what he is going to receive for the milk he delivers from day to day. The dealer, therefore, by the use to which the product is put, determines the actual payment to the producer for each hundredweight, or the blended price of each hundredweight. In reaching prices to be paid producers it is not proper to segregate the different grades or classes of milk and have each stand on its own base. All classes should be considered in arriving at a reasonable minimum price to be paid:" Colteryahn Sanitary Dairy v. Milk Control Commission, supra 27. This case gives a detailed explanation and need for a blended price based on a utilization instead of a segregation rule and theory.

The milk producer sells but one basic product. Milk of uniform quality may bring widely different prices, depending upon the use made of it. Fluid milk brings the premium price commensurate with high sanitary standards and constant supply. Milk not distributed in fluid form is often referred to as "surplus" milk and it is generally used for manufacturing food products, all of which sell at much lower figures according to the market value of the products often established by shipments from without the State. Insofar as it is not used as a beverage it is surplus milk, but at least part of the surplus is necessary to maintain an adequate supply of milk at all times: Rohrer v. Milk Control Board, supra; Nebbia v. New York, 291 U. S. 533;

Rieck-McJunkin Dairy Co. v. Milk Control Commission, 341 Pa. 153. Under Colteryahn Sanitary Dairy v. Milk Control Commission, supra, the commission must fix a price which yields a reasonable return on the basis of the utilization scheme of marketing and the court refused to countenance a fixing of prices by segregation. The farmer who meets the high sanitary requirements for fluid milk finds no consolation in knowing that for the amount of milk that is not consumed in fluid form he will receive a price competitively satisfactory for less carefully prepared milk. All the milk is produced for one particular purpose so there is no relationship between the use to which surplus milk is put and the cost of producing that milk. The utilization system of paying for milk was devised to afford producers as much as possible for milk consumed in fluid form without losing sight of the influence of market prices of products made of milk on the price able to be paid for milk used to make those products. Under the classification or utilization plan of paying for milk, milk to be consumed in fluid form, requiring great care in production and handling, is paid for in line with established retail and wholesale prices for fluid milk, these prices being high enough to help compensate for loss suffered by producers for surplus milk where the prices are low.

The power to fix prices may be delegated to a milk control board so long as the legislature sets the standard, leaving to the board its proper administrative function: 22 Am. Jur. 865, Food, sec. 77. Section 301 of the 1937 act provides:

"The commission is hereby declared to be the instrumentality of the Commonwealth for the purpose of administering the provisions of this act and to execute the legislative intent herein expressed, and it is hereby vested with power to supervise, investigate and regulate the entire milk industry of this Commonwealth, including the production, . . . storage, distribution,

delivery and sale of milk and milk products in this Commonwealth, and including the establishment of reasonable trade practices. . . ."

The responsibility as to what the price of milk should be to the producer rests first on the Milk Control Commission, "the legislative agency, exercising legislative power": Colteryahn Sanitary Dairy v. Milk Control Commission, supra, 22. What elements are proper factors in price-fixing "is a legislative matter for the Commission to decide. Its conclusion should not be disturbed by courts unless the inclusion or exclusion of material items is arbitrary or capricious": Ibid, 32. It is not arbitrary or capricious for the commission to make and enforce. a general order to the effect that one occupying the dual position of milk dealer and producer must treat milk from his own herd in the same way as he treats milk from other producers without preference or discrimination and that he may not place all milk produced by his own herd in the utilization class commanding the highest price to the detriment of other producers furnishing the same basic commodity but utilized by the dealer in such manner that their milk is not utilized similarly and with a corresponding return to the other producers. Appellant as a producer should receive the same blended return for the milk, produced by his own herd, becoming a part of the aggregate of the pool of grade B milk marketed by him from his single distributing plant as other producers receive for the milk contributed by them to the same pool of grade B milk with due regard being given to weight, butterfat basis and utilization of the aggregate of milk contributed to the pool of milk marketed as grade B milk and milk products. The intent of the act and of the commission's general order require that no producer, including appellant, who contributed milk to this single pool of grade B milk, should have extended any special privileges or immunities not enjoyed by all, for otherwise the statute

and order offend constitutional requirements of uniformity of operation or constitutional prohibitions against special privileges and immunities. The provision of the general order invoked by the commission against appellant for milk produced by his own herd treats all producers, including appellant, with equal fairness, assures each a stable price, protects each from the hazards which have proved so harmful to their welfare in the past, and distributes equally and fairly the necessary burdens of the business. Although the regulation when enforced against appellant may be in derogation of his common-law rights, it is not against due process under such circumstances.

The Supreme Court in Colteryahn Sanitary Dairy v. Milk Control Commission, supra, has held that in a determination of prices to be paid milk dealers for different grades of milk under the statute empowering the commission to fix minimum prices to be paid therefor, it is not proper for the commission to segregate the different grades or classes of milk and have each stand on its own base but all classes should be considered in arriving at a reasonable minimum price to be paid. Segregation means "to separate or set apart, cut off from others or from the general mass or main body": Foundation and Construction Co. v. Franklin Trust Co. et al., 307 Pa. 10, 15. Although prices arrived at by segregation are forbidden under the case of Colteryahn Dairy v. Milk Control Commission, supra, on a basis differing from the basic right contended for by appellant, nevertheless for appellant to be permitted to segregate all his milk in the class paying the highest price to the detriment of other producers is in violation of the intent of the Milk Control Law and in frustration of its purpose.

When appellant makes himself a producer, he is not entitled on the utilization basis to stand differently from other producers. As a producer, he is one of the cross-section representative of normally efficient pro-

ducers in this milk area, the basis for ascertaining the amount necessary to yield a reasonable return for producers, and to urge that his cost of production is high because of modern methods of production avails nothing under the regulations and general orders as they exist. If appellant can properly prove that under his methods of production he is entitled to a reclassification and to a price differing from the prices established under the official order, he has redress under section 801 to file an application in writing with the commission to "alter, revise or amend an Official Order fixing prices to be charged or paid for milk" in the future. The reasonableness of price is a question which should be raised before the commission or by an appeal from its official order. Without an appeal an order is a final order and the reasonableness of the rate cannot be questioned collaterally: Commonwealth v. Jackson, 345 Pa. 456.

Appellant, in support of his contention, relies mainly on Green et al v. Milk Control Commission of Pennsylvania, 340 Pa. 1, and the cases relied upon by the lower court in its decision of the same case. These cases do not control us. The case of Green v. Milk Control Commission of Pennsylvania decides that the Milk Control Law was not inclusive enough to cover consignment contracts and that the commission was without jurisdiction or power to require milk dealers receiving and selling milk as consignees from producers to file bonds with the commission for the protection of producers or to pay producers minimum prices fixed by the commission. The injunction granted was prospective in operation. In the instant case, the commission expressly had jurisdiction and power to fix the prices to be paid the producers herein involved. It is urged upon us section 3 of the official general price orders fixes minimum prices to producers for milk sold to milk dealers to be resold and that section 7 of General

Order B-1 refers only to utilization of milk purchased from producers; and that the court erred in Grow v. Milk Control Commission, supra, when it said that in his dual capacity the milk dealer purchased from himself as producer. Under the undisputed evidence in the instant case, however, appellant, by his own records, shows that he paid himself for milk received from his own herd, for on his payroll for milk he gave himself a producer's number monthly and paid himself the same as he numbered and classified other producers on his milk pay-roll. Apart from this, however, under section 11 of General Order B-1 dealers shall be responsible to producers for payment, inter alia as determined by the utilization of the aggregate of milk received at each plant or receiving station. There is nothing inconsistent or repugnant between section 7 and section 11 of General Order B-1.

Appellant urges, however, that in section 11 of General Order B-1 "received" means only milk "purchased" or milk "sold" by a producer and that "received" involves a change of possession from one to another, and that the word "aggregate" does not include milk received from appellant's own herd. "Aggregate" is defined as "a total or gross amount"; "any combined whole considered with reference to its constituent parts"; "considered as a whole": In re Estate of J. Henry Miller, Deceased, 110 Pa. Superior Ct. 384, 386. We should not exclude the milk from appellant's herd from the "aggregate of milk" in a consideration of section 11 of General Order B-1.

The word "receive" does not necessarily mean "to buy" or "to sell". The word "receive" is, like many words in our language, a relative term, and its meaning or signification may be different, according to the circumstances under which and the connection in which it is employed. The term has been variously defined as meaning, inter alia "to have" or "to take from a source": 52 C. J. 1191, Receive, sec. 1. Since a broad

and general view of the act and of the general order must be taken with an exact conception of their aim, scope and object, we conclude that "aggregate of milk received at each plant or receiving station" includes milk received from appellant's own herd which is utilized as grade B milk as well as milk received from other producers. To require the milk produced by appellant's own herd to be considered an element in utilization is a proper factor in price fixing for producers, is not arbitrary or capricious, promotes equal fairness to all, assures each a stable price, protects the other producers from the hazards which are harmful to their welfare, distributes equally and fairly the necessary burdens of the milk business, and best protects the milk industry of the Commonwealth.

We do not agree with appellant that the commission was without power under section 608 of the act to make such an order as section 11 of General Order B-1. Were he correct, however, it must be borne in mind that he voluntarily applied for a milk dealer's license and gave a bond required to be filed with the application and obtained its approval by the commission. Under section 501 the bond was "conditioned for the payment by the milk dealer of all amounts due, including amounts due under this act and the orders of the Commission, for milk sold by such producers to the milk dealer during the license year, upon such terms and conditions as the Commission may prescribe". In Commonwealth ex rel. Margiotti v. Ortwein et al., 132 Pa. Super. Ct. 166, it was held that where a defendant voluntarily applied for a milk dealer's license and gave a bond approved by the commission, both the dealer and surety on the bond are barred from denying liability on the bond on the ground of the alleged unconstitutionality of the provisions of the law requiring license and bond. Were we to assume the invalidity of section 11 of General Order B-1 to be a fact, appellant similarly would be barred from raising the alleged

invalidity of said section 11 requiring payment to be made in accordance with the terms and conditions thereof, and he would be liable for payment to producers for the product sold and delivered by them to appellant in accordance with the orders of the commission. The primary object of the bond is to assure milk producers that they will be paid for the product sold in accordance with such established orders and producers should receive the protection furnished by the bond in reliance on which the milk was sold.

And now, July 15, 1946, the order of the Milk Control Commission of the Commonwealth of Pennsylvania is affirmed and the appeal of John F. Rau, trading as Rau's Dairy, is dismissed at his cost.