## Pennsylvania Milk Control Commission v. Royale Dairy Company

*Harry L. Siegel* and *Thomas D. Caldwell*, for appellant.

*John J. Snyder*, for appellee.

UTTLEY, P. J., November 9, 1948.—The Royale Dairy Company, a Pennsylvania corporation, with its place of business at 45-46 West Juniata Street, Lewistown, Mifflin County, Pa., is the holder of a milk dealer's license no. 1129, under the Pennsylvania Milk Control Law of April 28, 1937, P. L. 417, as amended.

On August 7, 1947, the Pennsylvania Milk Control Commission cited the Royale Dairy Company above named, to show cause why its milk dealer's license for the year May 1, 1947, to April 30, 1948, and its right

to apply for a milk dealer's license for the year May 1, 1948, to April 30, 1949, should not be revoked or suspended for the reason that Royale Dairy Company had failed to account and make payment for milk purchased and received from milk producers during the period March 1, 1947, to and including June 30, 1947, in accordance with the general orders of the Milk Control Commission of Pennsylvania.

After a hearing upon this citation, held at the offices of the commission in Harrisburg, on August 26, 1947, at which the Royale Dairy Company was represented by counsel, the milk dealer's license of the Royale Dairy Company for the year May 1, 1947, to April 30, 1948, and its right to apply for a milk dealer's license for the year May 1, 1948, to April 30, 1949, were on March 12, 1948, revoked by the Milk Control Commission.

The Royale Dairy Company presented its petition and appealed from the above order of the Milk Control Commission to this court, which on March 31, 1948, made an order allowing the appeal, directing that the same should act as a supersedeas of the order appealed from, and providing that the order of the court should become effective upon the filing by appellant of a bond approved by the court in the amount of $1,500. A bond in the amount named, approved by the court, was duly filed by appellant.

The legislative findings of fact in the preamble to the Milk Control Law recognize, inter alia, that milk consumers are not assured of a constant and sufficient supply of pure wholesome milk unless the high cost of maintaining sanitary conditions of production and standards of purity is returned to the producers of milk; that milk producers must make delivery of their perishable commodity immediately after it is produced and must generally accept any market at any price; that only dealers have facilities for accurately testing and weighing milk; that the producers' lack of control

over their market is aggravated by the trade custom of dealers in paying weeks after delivery, keeping producers obligated to continue delivery in order to receive payment for previous sales, and permitting dealers to operate on the producer's capital without giving security; and that hence, milk producers are subject to fraud and imposition and do not possess the freedom of contract necessary for procuring the cost of production.

The title of the Milk Control Law, therefore, states that it is enacted for the purpose of regulating and controlling the milk industry in the Commonwealth for the protection of public health and welfare and for the prevention of fraud.

By the provisions of article III, sec. 307 of the Milk Control Law of April 28, 1937, P. L. 417, as amended, 31 PS §700j-307, the Milk Control Commission is authorized and empowered, subject to the approval of the Governor, to "adopt and enforce all rules, regulations and orders necessary or appropriate to carry out the provisions of this act and not inconsistent with the law".

The power of the commission to make orders fixing the price of milk in reasonable milk market areas, the procedure by which this power is to be exercised, and the right of appeal therefrom is provided by sections 801, 802, and 803 of the act, 31 PS §§700j-801, 802 and 803; the power to fix the terms upon which dealers shall pay producers for milk, the method of computing the payment therefor and the statement to be sent by the dealer to the producer, is provided by section 806 of the act, 31 PS §700j-806; and the power and method of revoking a milk dealer's license for a violation of any of the provisions of the act or any of the rules, regulations or orders of the commission is provided by sections 404 and 405 of the act, 31 PS §§700j-404 and 405.

The commission, by its General Order No. A-209, established the Johnstown-Altoona milk marketing area, which includes the County of Mifflin, fixed the minimum prices for milk and certain milk products and otherwise regulated the production, marketing and distribution of milk and milk products therein and by its General Order No. A-7, established and fixed the minimum prices to producers for grade A milk and otherwise regulated the production and marketing of grade A milk in the Commonwealth of Pennsylvania.

On May 24, 1937, the commission issued its General Order B-1, regulating the production, marketing and distribution of milk and milk products in all milk marketing areas in Pennsylvania with respect to methods of payments, fair trade practices and records of dealers.

The question involved in this appeal concerns the power of the commission to enforce the twelfth and thirteenth paragraphs of its General Order No. B-1, which read as follows:

"Section 12. *TERMS OF PAYMENT.* Payment to producers, or to a cooperative agricultural association selling milk or cream on behalf of producers, shall be made not later than the last day and the fifteenth day of each month as follows: A payment that approximately covers the value of the milk or cream delivered from the 1st to the 15th inclusive, shall be made not later than the last day of the month. Such payment need not necessarily be accompanied by an itemized statement. All milk and cream delivered from the 16th to the last day of the month, inclusive, shall be paid for not later than the 15th day of the succeeding month, and such payment shall be accompanied by a complete statement to each producer or cooperative agricultural association, rendering in detail a full account of all milk or cream purchased during the entire preceding

month, upon such a form as the Commission shall hereinafter prescribe, and shall include any amount due from the period of the first payment. In the event of overpayment for milk of the first period the amount of overpayment shall be deducted. In the event of underpayment for milk in the first period the amount shall be added. The statement shall show such adjustments. This section shall not be interpreted to prevent dealers from paying their producers on a weekly basis. However, said dealers paying on a weekly basis must give to producers a monthly statement as hereinafter prescribed in this Official General Order.

"Section 13. *MONTHLY STATEMENT TO PRODUCERS.* All dealers purchasing milk or cream from producers or from cooperative agricultural associations selling milk or cream on behalf of producers, shall render to each producer or cooperative agricultural association, not later than the 15th day of each month, a statement showing in detail a complete and full accounting for all milk or cream purchased during the preceding month."

Appellant's license as a milk dealer was revoked by the Milk Control Commission on the ground that it failed to account and make payment for milk purchased and received from milk producers during the period of March 1, 1947, to and including June 30, 1947, in accordance with general orders of the Milk Control Commission, resulting in underpayments to milk producers for that period in the amount of $1,482.39. This amount of the underpayments for the period is admitted. The commission, however, stated in its eighth finding of fact that the entire amount of the underpayments above stated occurred during the license year May 1, 1947, to April 30, 1948, whereas $196.35 thereof occurred in the license year May 1, 1946, to April 30, 1947. It was therefore stipulated of record by counsel that the underpayments of $322.65

and the net overpayments of $4,844.90 during the year May 1, 1946, to April 30, 1947, be incorporated in and made a part of the original record to be considered by the court; the underpayments during the year 1947 to 1948 not to be considered by the court and the court's determination of the issue for the license year 1946 to 1947 to be applicable to the license year 1947 to 1948. We have, therefore, the admitted fact that defendant did underpay the producers of milk $146.30 in September 1946, $108.67 in March 1947, and $67.68 in April 1947, aggregating underpayments of $322.65 to producers during the license year 1946 to 1947, and consequently did not pay the producers of milk for the months above named the minimum price fixed by the commission's General Orders A-209 and A-207, in the manner required by the commission's General Order B-1.

The Milk Control Law has been held by the Supreme Court to be constitutional: Rohrer v. Milk Control Board, 322 Pa. 257; Colteryahn Sanitary Dairy v. Milk Control Commission, 332 Pa. 15, 20; Rieck-McJunkin Dairy Company v. Milk Control Commission of Pennsylvania, 341 Pa. 153, 156.

There is no contention here that the commission did not observe all the requirements of section 801 of the act in adopting and promulgating its General Orders A-209, A-7 and B-1. Although the required notice of the hearings, which resulted in the promulgation of the general orders above mentioned, was given, defendant did not appear at the hearings and took no appeal from these general orders of the commission after they were promulgated. These general orders therefore stand unchallenged. Before a person who is subject to the regulations of an administrative commission of the legislature can appeal from an order of the commission to the courts he must exhaust his administrative remedy. Chief Justice Kephart in Colteryahn Sanitary

Dairy v. Milk Control Commission, supra, at pages 23 and 24, speaking for the Supreme Court, said:

". . . It is well settled under the Act of March 21, 1806, P. L. 558, section 13, that where statutory remedies are provided, the procedure prescribed by the statute must be strictly pursued, to the exclusion of other methods of redress: Bowman v. Gum, Inc., 321 Pa. 516; Commonwealth ex rel. v. Margiotti, 325 Pa. 17, 32. This is particularly true of special statutory appeals from the action of administrative bodies: White et al. v. Old York Road Club et al., 318 Pa. 346; Taylor v. Moore, 303 Pa. 469; Ermine v. Frankel et al., 322 Pa. 70. . . ."

Therefore, neither the reasonableness of the minimum prices fixed by General Orders A-209 and A-7 and whether such minimum prices will yield a reasonable return to the milk dealers, nor the reasonableness of the terms of payment by the dealers to the producers provided by General Order B-1, are raised by or involved in this appeal. The validity of General Order B-1 fixing the terms of payment to the producers was settled upon the appeal of a number of milk dealers, not including defendant, therefrom to the Court of Common Pleas of Dauphin County, Commonwealth docket 1937, nos. 126-175, in which appellants and the commission entered into a stipulation that all the provisions of General Order B-1 were valid except section 6, concerning milk resold in other States not here involved, in pursuance of which stipulation the Court of Common Pleas of Dauphin County made the following order:

"And now, November 6, 1940, upon examination of General Order B-1 of the Milk Control Commission and the record in support thereof, it appearing that part of this order is valid and part of it invalid, it is hereby ordered, adjudged and decreed that section 6 of General Order B-1 is void, and this appeal is sus-

tained as to section 6 of that general order, and as to the remaining sections of General Order B-1 it is ordered, adjudged and decreed that these sections are valid and the order is affirmed."

The sole question for the court in this case, therefore, is whether appellant, under the Milk Control Law and the general orders of the Milk Control Commission, has the right to set off what it refers to as overpayments, that is, payments in excess of the minimum price to producers, during some months of the year, against what it refers to as underpayments, that is, payments of less than the minimum price to producers, during other months of the same year. Stated another way, should General Order B-1 of the commission, notwithstanding the clear and unambiguous language and meaning thereof, in order to carry out the intent and purpose of the Milk Control Law, be so construed as to permit the milk dealer to compel the producer to wait longer than the fifteenth day of each month for the payment of the full amount of the minimum price due him for milk sold to the dealer during the preceding month and then set off the overpayments, that is, payment in excess of the minimum price to the producer, made in months when milk was in great demand on a competitive market, against the underpayments, that is, payments of less than the minimum price to the producer, made in months when milk was in over-supply.

The Milk Commission contends that the prompt payment monthly of this minimum price, by the dealer to the producer, is a vital and necessary part of the general procedure and regulations, established by the commission to insure the return to the producer of the high cost of maintaining sanitary conditions of production and standards of purity and to provide a constant sufficient supply of pure wholesome milk.

The intention and purpose of the legislature in the passage of the Milk Control Law appear clearly in the preamble thereto and can therefore be obtained without resort to the Statutory Construction Act. This preamble recites what are designated as legislative findings of fact for the very purpose of making manifest the intention and purpose of the law. It shows the legislature realized that, by reason of the perishable character of milk, the producers must market it immediately after it is produced and must generally accept any market at any price. It recognizes also that the producers' lack of control over their market is aggravated by the trade custom of dealers in paying weeks after delivery and keeping producers obligated to continue delivery in order to receive payment for previous sales. How could the Milk Control Commission have more clearly carried out the intention and purpose of the legislature, expressed in the clause of the preamble last above mentioned, than by providing the terms of payment to producers, for milk and cream, set forth in the twelfth and thirteenth paragraphs of its General Order B-1 above quoted? The provision that payment shall have been made on or before the fifteenth day of each month for all milk and cream furnished during the preceding month not only assures the producer of the prompt payment each month of the minimum price for all milk and cream delivered during the preceding month, but also that he will receive in addition thereto, during the months when there is a competitive market, the excess of the market price over his minimum price, at the time he delivers his milk. The prices fixed by General Orders A-209 and A-7 are minimum prices. These minimum prices must always be paid the producer unless changed by the commission. There is nothing in the Milk Control Law or the general orders of the commission, however, which prevents the producer from obtaining or the dealer from paying the

full market price for milk and cream, at all times. When milk is in oversupply, the producer is entitled to at least the minimum price, and when milk is scarce and the demand exceeds the supply he is entitled to the minimum price plus whatever the market price is in excess thereof. The fair market price during the months when the demand exceeds the supply, as well as the minimum price when milk is in oversupply, belongs to the producer. It is his. To regard the market price paid the producer, in excess of the minimum price fixed by the commission, as a bonus or overpayment of the dealer to the producer would be incorrect, and to allow the dealer to apply these amounts of the market price in excess of the minimum price, upon the arrearages for the months when the dealer has failed to pay the minimum price would be, in effect, to permit the dealer to pay these arrearages with money which actually belongs to the producer. The payments in excess of the minimum price by appellant to the producers, during some months of the year, were not made for the purpose of making up the arrearages of the minimum price due the producers for other months but as the full market price due the producers for their milk at the time it was delivered. If appellant's contention were to prevail it is entirely possible and might occur that the so-called overpayments to the producer might aggregate such a gross amount that the producer would receive nothing for his milk during the flush period, which according to both parties is usually the last two months of the license year. This would be contrary to the intent and purpose of the law and the general orders of the commission above quoted which clearly require that the producer shall be paid not later than the fifteenth day of each month, not only the minimum price fixed by the commission but also, in addition thereto, whatever the dealer owes the producer by reason of the excess of the market price over the mini-

mum price for the milk delivered by the producer to the dealer during the preceding month.

The only time when a minimum price has any value to the producer is during the period of approximately two months in the spring of the year when milk is in oversupply. During the remaining months of the year, according to the briefs of counsel for both parties, by reason of a competitive market and the laws of supply and demand, the market price of milk equals or exceeds the minimum price to the producer. It is therefore during the flush period of the spring, that it is not only necessary but vital, that the producers should receive the minimum price of milk fixed by General Orders A-209 and A-7 and also that the full amount of that minimum price should be paid to the producers promptly each month in accordance with General Order B-1, in order that the producers during that period can maintain the sanitary conditions of production and high standards of purity required to assure a constant sufficient supply of pure wholesome milk. The fallacy of defendant's entire argument, in our opinion, is in assuming that the dealer has done its full duty to the producer according to the intent and purpose of the Milk Control Law, and the general orders of the Milk Control Commission above stated, when it makes up the underpayments of the flush period in the spring of the year out of the so-called overpayments made to the producer during the balance of the year. It ignores the right of the producer, not only to the prompt monthly payment of his full minimum price during the spring months of the year but also to his share of the profits from the full market value of his milk caused by the competitive market during the remaining months of the year. Without this right the minimum price has no significance to the producer and the general orders of the commission would be a nullity.

The real meaning of appellant's contention in this case is that the minimum price of milk to the producer fixed by General Orders A-209 and A-7, together with the terms of payment thereof fixed by General Order B-1, under the milk marketing conditions of this area, do not yield a reasonable return to the dealer. As we have already stated, however, the question of a reasonable return to the dealer was settled when the general orders above mentioned were adopted and promulgated by the commission. As no appeal was taken by defendant therefrom, as provided by section 801 of the Milk Control Law and these official general orders, on the appeal of a number of other dealers, have been held legal by a court of competent jurisdiction, that question cannot now be raised by defendant on this appeal.

Appellant argues that its overpayments so greatly exceed its underpayments during the license year that a supply of pure wholesome milk is assured. This argument ignores appellant's direct violation of a valid official general order of the commission, adopted to carry out the intention and purpose of the law to assure, generally, a constant supply of pure wholesome milk. The Milk Control Law and General Order B-1 are general and apply to all dealers in the Commonwealth. Appellant is but one dealer in one county. If it can ignore this general order of the commission then every other dealer in the Commonwealth can ignore it. Can it be reasonably contended that if all the dealers in the Commonwealth adopted the policy of appellant and refused to pay the minimum price to the producer, promptly each month, during the two flush months of the year, as required by General Order B-1, that it would not interfere with a constant sufficient supply of pure wholesome milk? Such a policy if adopted by the milk dealers generally, could and might affect the sanitary conditions of production and standards of purity and interfere with a constant suf-

ficient supply of pure wholesome milk, not only during the two flush months but also during the other months of the year.

We are unable to see why the provision of the law fixing the dealer's license, license fee and bond on an annual basis is any reason for permitting the minimum price to producers to be fixed upon an annual basis and the dealers to make up the underpayments in the flush period with the so-called overpayments during the balance of the year. Fixing the license, license fee and bond for any less period would be impracticable and unworkable. It is significant in this connection that the amount of the bond is fixed by section 501 of the law, at a "sum equal to the value of the highest amount of milk purchased, acquired or received by the dealer or handler from the producer in any one month during the preceding calendar year". Furthermore the Milk Control Law does not require the commission to fix the price of milk on an annual basis. To do so would prevent the commission from adjusting the prices to the changing economic conditions when necessary. The commission may be and as a matter of fact has been compelled to issue official general orders changing prices two or three times during the license year.

The only case cited which is directly in point is Grow, etc., v. Milk Control Commission, 52 D. & C. 225. Appellant there was a producer as well as a dealer. The commission's refusal to issue a dealer's license to appellant "was based upon its conclusion that appellant had failed to account and make payment for milk purchased and received from producers during the period from July 1, 1940, to April 30, 1941, in accordance with the commission's orders to the extent of $705.03". The charge in that case that appellant was guilty of underpayments to producers grew out of the fact that he distributed the milk from his own herds to consumers without pooling it with the milk received from

other producers in determining its utilization. This resulted in placing all the milk from his own herds in class 1, commanding the highest price and in a lower percentage of milk purchased from other producers being used in class 1, with a consequent lower financial return to such other producers. Judge Knight of Montgomery County, who wrote the opinion, held this was a violation of section 11 of General Order B-1. Therefore, appellant in that case was charged with underpayments to the producers between certain dates. The audit in the case was confined to the citation period and appellant contended if the whole audit were considered it would show overpayments in excess of underpayments found by the commission to exist during the citation period and that these overpayments should be credited against the underpayments. The court then stated, at page 231, as follows:

"Appellant was charged with underpayments between certain dates, and the evidence was properly confined to this period. If the commission were to introduce evidence of underpayments at times outside the citation period, appellant would have been the first to object and properly so. Since the entire audit was not before the commission, that body could not make findings of fact based thereon. Appellant argues that, if the whole audit were considered, it would show overpayments in excess of the underpayments found by the commission to exist during the citation period, and these overpayments, so contends appellant, should be credited against underpayments.

"We cannot agree with this. The Milk Control Act, sec. 803, authorizes the commission to fix by official order the minimum prices to be paid by milk dealers to producers. General Order B-1, sections 11, 12, and 13, provides that payment by dealers to producers shall be made on a monthly basis. The act, as we read it, does not give the commission authority to fix

a maximum price to be paid by dealers to producers for their milk, nor, so far as we have been informed, has the commission established any such maximum price. There is nothing, then, to prevent a dealer from paying more than the minimum price for milk he receives from a producer.

"It seems obvious to us that such voluntary overpayments cannot be set off against established underpayments. Of course, if the overpayments were made by inadvertence or mistake, a different situation would be presented, but there is no finding of the commission showing overpayments, nor does the record disclose why the overpayments were made. The commission has found as a fact that the underpayments during the citation period amount to $705.03, and there was evidence to support this finding."

We cannot agree with the learned counsel for appellant in this case that the language of Judge Knight above quoted is merely obiter dicta. If it may be so considered it is at least the opinion of a very learned judge clearly stated on the identical question here raised.

While the case above cited is the only one where this identical question has been raised, there is a striking analogy between the case at bar and the cases in the United States courts under the Fair Labor Standards Act which provides minimum wages and empowers the Wage and Hour Administration to fix other minimum wages. The Federal courts have uniformly refused to allow employers to offset higher than minimum wages in one week against underpayments of wages in other weeks. In Roland Electrical Company v. Black, 163 Fed. (2d) 417, in which a certiorari was denied, 333 U. S. 854, the United States court of appeals said (163 F. (2d) 420-421) inter alia:

"Under these circumstances, we are in accordance with the decision of the District Court, in so far as it holds that payments in excess of the amount required by the statute to an employee for work done in certain weeks do not relieve the employer from the obligation to compensate the employe for deficiencies in other weeks, or from the obligation to pay him in addition an equal sum for liquidated damages. . . . Furthermore, the so-called excess payments in certain weeks were not made or intended to be made as compensation for overtime work within the contemplation of the Act but as additional compensation for work done by the employees during the less desirable parts of the day."

The work week was established by the Wage and Hour Administration as the unit for full payment of wages, under the Fair Labor Standards Act, just as the monthly basis for the payment of the minimum price of milk by the dealer to the producer was established by the Milk Control Commission under the Milk Control Law. In the first case the pay practices of employes and in the second the pay methods of the milk dealers brought about the passage of the act. In both cases the courts have held that overpayments, that is, payments in excess of the minimum in one period, cannot be set off against underpayments, that is, payments of less than the minimum in another period.

Numerous other cases, refusing to allow the offsetting of heavy pays against light pays, including the cases from the courts of a number of States, might be cited to illustrate the analogy between the case at bar and the cases under the Uniform Labor Standards Act and in support of the opinion of Judge Knight of Montgomery County in the Pennsylvania case above stated.

For the reasons above set forth, we are of the opinion that under General Order B-1, adopted and promulgated by the Milk Control Commission under the Milk Control Law, appellant was legally bound to pay promptly on or before the fifteenth day of each month, the minimum price to the producer fixed by the commission's General Orders A-209 and A-7, for all milk sold and delivered to appellant by the producers during the preceding month and that appellant had no right to set off the so-called overpayments, that is, payments in excess of the minimum price, made during some months of the year against the so-called underpayments, that is payments of less than the minimum price, during other months of the same year. Therefore, the appeal in this case will have to be dismissed.

### Decree

Now, November 9, 1948, after due consideration, the appeal in the within case is hereby dismissed at the cost of appellant.