Rutenberg et al., Appellants, *v.* Philadelphia et al.

Argued November 24, 1937. Before SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Simon Pearl,* with him *Speiser & Speiser,* for appellants.

*John J. McDevitt, Jr.,* with him *Joseph M. Leib,* for Controller, appellee.

*James Francis Ryan,* Assistant City Solicitor, and *Joseph Sharfsin,* City Solicitor, for City, appellee.

*Graham C. Woodward,* for Treasurer, appellee.

OPINION BY MR. JUSTICE BARNES, January 3, 1938:

This appeal challenges the constitutionality of the "1937 Magistrates' Court Act." This act contains two classes of provisions, those providing for a civil division of the magistrates' courts, and those relating to their criminal side. We are of opinion that while the sections setting up a so-called civil division are invalid, the sections relating to the criminal jurisdiction of these courts are constitutional and severable from the invalid provisions of the act.

It seems to us that the primary purpose of the act is to effect worthy and needed reforms in the administration of criminal justice in these courts.

As the history of the minor judiciary in Philadelphia is studied, it is seen that there has been a persistent public demand for reform and improvement in the operation of the magistrates' courts, especially in the criminal branch of their jurisdiction. Public spirited citizens, civic bodies, lawyers and other groups have denounced the evils which developed from time to time, and generously have devoted their efforts toward the correction of abuses in the magistrate's courts.

To understand the purposes sought to be accomplished by the present legislation, a review of the attempts heretofore made to reform the minor judiciary is justified. For many years prior to the Constitution of 1873, the powers and duties exercised elsewhere in the state by justices of the peace were vested in aldermen within the limits of the original City of Philadelphia.[1] The aldermen's courts having fallen into disrepute, when the present Constitution was adopted the office of alderman in the city was abolished, and, by Sections 1 and 12 of Article V thereof, the creation of magistrates' courts was authorized. As these clauses of the Constitution were not self-executing, legislative action in the establishment of these courts was required: *In re Cahill,* 110 Pa. 167. The mandate of the Constitution was carried out by the legislature in the passage of the Act of May 25, 1874, P. L. 224, repealed and supplied the next year by the Act of February 5, 1875, P. L. 56, which set up the magistrates' courts in Philadelphia substantially as we have them today.

The Act of 1875 provided for the creation of twenty-four courts (increased to twenty-eight courts in 1887) not of record, of police and civil causes, with the same jurisdiction, not exceeding one hundred dollars, formerly exercised by the aldermen; magistrates were to be

---

[1] See "The Magistrates' Courts of Philadelphia" by Spencer Ervin, Esq., of the Philadelphia Bar, published 1931, under the auspices of the Thomas Skelton Harrison Foundation, at page 4, et seq.

elected by the voters of the city at large and to hold office for a term of five years (extended to six years by constitutional amendment in 1909). The only qualifications for the office were that the magistrate be a voter of the City of Philadelphia, a resident therein at least one year immediately preceding the election, and that he shall have attained the age of twenty-five years. The exact locations of the courts in the city were to be fixed by Philadelphia city councils and magistrates were required to cast lots for the order of choice of the particular court to which each one was assigned during his term of office. A salary of $3,000 per annum was substituted for the fee system by which the aldermen were paid, and the magistrates were compelled to account for all costs, fees, fines and penalties collected by them. The salary was increased to $4,000 in 1917, and from this salary the magistrate must provide for the rent and maintenance of his courtroom and office, as well as for the cost of supplies and clerical assistance. Civil and criminal dockets were required to be kept by the magistrates, as well as a day book, such books to be the property of the Commonwealth, and to be subject to inspection by any citizen during the hours when the courts were open. Magistrates were empowered to select from their number "such magistrates as shall be necessary to act as committing magistrates at the several police stations in the City of Philadelphia."

Over a period of fifty years but few changes were made in the magisterial system established under the Act of 1875. In the meantime, such abuses developed in the conduct of these courts that in 1926 the Law Association of Philadelphia appointed a committee of its members, known as the "Crimes Survey Committee," to make a study of the administration of criminal justice in these courts. A report of this committee,[2] after a com-

---

[2] See report of the Crimes Survey Committee, 1926, in the Library of the Law Association of Philadelphia.

prehensive inquiry into the conditions needing reform, was made to the Association and referred to its Committee on Legislation for the purpose of securing from the legislature changes in the existing law. These efforts resulted in the passage of the Magistrates' Act of 1927.[3]

The changes effected by this act accomplished little in the way of reform. The act established a board of magistrates and created the office of a chief magistrate to coördinate the business of the twenty-eight independent courts; it provided that the magistrates adopt rules for uniform practice and procedure in their courts and for uniform dockets and documentary papers. The chief magistrate was elected by the magistrates from among their number, and in addition to his other duties was made the administrative head of all magistrates' courts. The existing twenty-eight courts were retained, as was also the Central Station in City Hall, but the entire expense of providing dignified, clean and properly located courtrooms, their equipment and maintenance, was placed upon the city instead of upon the individual magistrates as theretofore. The salary of magistrates was increased to $5,000 per annum, while the salary of the chief magistrate was fixed at $6,000. Each magistrate was assigned a clerk whose salary was to be paid by the city.

While the Act of 1927 provided better facilities for placing these courts upon a higher level of respectability and public usefulness, important reforms advocated by the committee of the Law Association were disregarded by the legislature. The committee recommended that magistrates be divorced from politics by restricting

---

[3] See reports of the Committee on Legislation to the Law Association of Philadelphia, published in The Legal Intelligencer, December 3, 1926, page 1088; December 10, 1926, page 1108; January 28, 1927, page 80, and June 10, 1927, page 578.

them to the performance of their duties and forbidding them to engage in any business or profession, or to serve in any capacity as the representative of any political party, organization or committee; further, that the hearings of all charges of felony and the more serious misdemeanors be concentrated in six permanent court-rooms or stations throughout the city, such hearing centers to be established in addition to the existing magistrates' courts and the central station in City Hall; that the magistrates be required, in proper rotation of service, to conduct such hearings and to have present, attached to each station, a stenographer to record the testimony taken at the hearings; that the district attorney be notified by the magistrate of the times and places of hearings in felony cases, in order that he might have a representative of his office present; that the chief magistrate be appointed by the Governor. Appropriate provisions embodying these reforms were eliminated by the legislature from the Act of 1927.

The "1937 Magistrates' Court Act," now before us, had its genesis in a special Grand Jury investigation into the operation of the magisterial system in Philadelphia. On June 15, 1936, the grand jury reported the existence of widespread illegal practices by the magistrates in the criminal branch of their jurisdiction, which had resulted in the denial of justice and the oppression of citizens. It recommended that a commission be appointed to consider the evils denounced and to devise methods for their suppression. Conditions which had defied all efforts of the past for correction not only continued to exist, but other vicious practices had developed in the system, such as the taking of worthless bail bonds, making possible the "fixing of cases" by continued hearings, releasing persons on copy of the charge, and in general the ineffectiveness and corruption of some of the magistrates in dealing with cases where rackets and organized crime were involved. A commission was ap-

pointed[4] which, after many public and private hearings and a thorough study of the system, formulated an act for the reformation of criminal justice in the magistrates' courts. The provisions of the act so proposed are fundamentally identical with the sections of the present act, relating to the criminal jurisdiction of these courts. It is important to examine several of these Sections, since the constitutionality of the entire Act is questioned.

Section 3 of the act says in effect that no magistrate shall engage in any other business or profession or hold any other public office, or serve as a representative of any political party or organization. The purpose of this section is to take the magistrates out of politics, and to insure that those elected to the office will devote full time to their duties.

On this subject the commission, in its report of February 15, 1937,[5] to the Governor and the General Assembly, said: "The principal underlying cause of most, if not all, of the evils and abuses which have crept into the administration of the magistrates' courts in Philadelphia, is the practically universal participation of the magistrates in politics. The temptation to which a mag-

---

[4] The members of this Commission were W. W. Montgomery, Jr., Esq., Chairman (designated by Philadelphia Bar Association); Hon. JAMES GAY GORDON, JR. (designated by the Governor of the Commonwealth); Hon. Grover C. Ladner and Hon. Curtis Bok (designated by the Attorney General); Hugh D. Scott, Jr., Esq., and John A. Boyle, Esq. (designated by the District Attorney); Joseph Sharfsin, Esq. (designated by the Mayor); Dr. Robert C. White, City Controller; Magistrate John J. O'Malley and Maurice J. Speiser, Esq. (designated by the Magistrates); Hon. Charles Edwin Fox (designated by the Criminal Justice Association), and Messrs. Stanford LaMar, Harry Margolis and George Miller (designated by the Grand Jury).

[5] See report dated February 15, 1937, of the commission appointed to Recommend Improvement in the Laws Relating to Magistrates, etc., in the Law Library of the Philadelphia Bar Association.

istrate is subjected to use the great powers of his office for his personal political aggrandizement, by granting immunity from criminal responsibility for political considerations, or by using his powers to oppress and extort factional political support from the citizen in difficulty with the criminal law, is, in the judgment of the commission, the fundamental weakness of the system."

Sections 4 to 8 inclusive, set up no substantial changes in the existing law. They provide for the records and books to be kept by magistrates, for the filling of vacancies in the office of magistrate, and require that the books and records of a vacant court be delivered to the chief magistrate rather than to the magistrate of the nearest court.

Sections 9 to 12 inclusive, provide for the establishment of divisional police courts, not less than ten nor more than fifteen in number, to be held in convenient police stations, presided over by magistrates designated by the chief magistrate to serve for the term of one month. A system of rotation is provided whereby "Every magistrate shall be assigned to each divisional police court in turn." Cases instituted by warrant issuing out of any particular magistrate's court are to be heard before the magistrate issuing the process, but all prosecutions involving felonies and the more serious misdemeanors initiated by police warrant or by arrest on sight are to be heard exclusively in these divisional stations. Section 11 specifically names these offenses. It seems clear since the Constitution authorizes the creation of one magistrate's court for each 30,000 inhabitants, even if these divisional courts are to be regarded as new magistrates' courts, they are still within the power of the legislature to create. Furthermore, no magistrate is deprived of any jurisdiction by their creation, because each magistrate in rotation sits in these divisional stations, and no magistrate who has issued a warrant is deprived of the right to have the offender brought before him for hearing.

The creation of these divisional stations with the further provision for a full stenographic report of all proceedings held therein, and with the presence of the district attorney's representative at hearings, constitute forward steps which have been urged for many years in the reform of these courts. The cases to be heard exclusively in the divisional courts are those in which abuses most frequently occur, and in which organized crime is known customarily to operate. It is not in cases of privately issued warrants that evils arise, but in arrests on sight and on police warrants. Heretofore, persons arrested in this manner had hearings at the station of the police district in which the arrest was made. These divisional stations have a more extensive territorial jurisdiction than police districts, and with rotation of magistrates there is less opportunity for "fixing cases."

The practice of releasing persons arrested "on copy of the charge" without entry of bail is abolished by Section 13. In many instances persons held by one magistrate have been released by another on copy of the charge without the taking of bail. Under the provisions of this section a person arrested, charged with any of the felonies or more serious misdemeanors specified in the act, cannot procure his release without entry of bail. In cases where persons are arrested charged with drunken driving, assault and battery and fraudulent conversion, and in other cases where the circumstances warrant, the magistrate may still release on copy of the charge without entry of bail. The rights of the public are safeguarded by a provision for the prompt issuance by the police department, without cost, of certificates or copies of the charge against any person, and it is also provided that all persons arrested shall be given the opportunity to communicate promptly with such persons as they may desire.

Section 14 is designed to combat the practice of some magistrates of continuing the hearing of criminal cases indefinitely and without valid reason. By the practice

of holding persons "for further hearing" opportunities are afforded for "the fixing" of cases between hearings, for the practice of extortion by police officers and others, and for the operation of sinister political influences. In many instances further hearings are necessary. The absence of material witnesses, the necessity for further investigation in a particular case, and other good reasons often justify and even require the holding of further hearings, and the right should not be abolished. This section of the act provides that whenever a continuance is allowed, whether by the magistrate of his own motion or at the request of a party, the reasons therefor shall be entered upon the docket and be returned as a part of the transcript of the case.

Sections 15 to 20, inclusive, seek to meet the need for drastic reform in the taking of insufficient or worthless bail. Probably the discharge of persons charged with crime, on "straw bail" has been the most harmful practice of the present system. Discharges have been issued without requiring full and proper justification of the surety offered, and the magistrates have been dilatory in returning bail to the quarter sessions court, or have entirely failed to do so. So-called "straw bondsmen" have imposed upon individual magistrates who had no facilities for checking encumbrances on real estate offered as security. It has been impossible for twenty-eight magistrates, acting independently, to detect and prevent the entry of fraudulent bail.

The present act provides for a thorough investigation by the magistrate into the sufficiency and the financial responsibility of the surety. He is required to obtain a written justification, under oath, in which it is stated, among other things, whether the property has been given as bail in any other case or for any other person. Before accepting bail he must obtain a "bail certificate" from the city controller, showing (a) the name of the owner of the property offered as security; (b) the amount of unpaid taxes thereon; (c) the amount of

liens thereon; (d) the assessed valuation; (e) whether the property has theretofore been accepted as security for bail, and whether that bail is still in force. It is provided that the controller keep a duplicate bail certificate. Upon acceptance of the real estate offered as bail, the magistrate must endorse upon the deed the name of the case, the acceptance of bail and the date and amount thereof. This notation can be cancelled only by the controller upon the discharge of the bail according to law. With these safeguards against fraudulent bail it becomes difficult for a magistrate to accept insufficient and fraudulent bail, even if he were willing to do so. Punishment for crime has been frustrated so often by straw bail that the value of these provisions cannot be overestimated.

There are other important reformative provisions in criminal jurisdiction contained in the remaining Sections of the act. These will not be discussed in detail, but one is deserving of mention as typical of others. In Section 43 the magistrates are deprived of any right to review, alter, modify or remit sentences or fines imposed by them, or to change a decision in any case except in the presence of and with the written approval of the prosecutor. The changing and remitting of fines and penalties at the solicitation of political or personal friends has been a shameful practice in the magistrates' courts.

Dealing then with what may be called the provisions that have to do with criminal or non-civil matters, we are of opinion that in this proceeding no general constitutional infirmity has been brought to our attention. As in all instances where this court is required by the pleadings to deal in general with a statute, we leave open, until properly raised, and after full argument, the question whether any particular Section or part of an act is invalid in circumstances that may then be presented: *Com. ex rel. v. Snyder*, 279 Pa. 234.

A civil division of the magistrates' court is established by Sections 21 to 30 inclusive, of the act. All civil cases are to be tried before three magistrates sitting for monthly periods as a court en banc in City Hall. There are fundamental changes made by the provisions of these Sections in the structure and administration of the magistrates' courts. Extensive powers are sought to be conferred upon the Chief Magistrate. On behalf of the plaintiffs it is urged that the effect of these provisions is to create one court of three magistrates having civil jurisdiction over the entire city, to the exclusion of the other twenty-five magistrates; that instead of having one magistrate for every 30,000 inhabitants, as the Constitution provides, or at least twenty-eight magistrates' courts as there are at the present time, there would be one magistrate's court for civil causes for approximately 2,000,000 inhabitants. The Constitution calls for a basic structure of subordinate tribunals to be located throughout the city. In *Renshaw v. Mayor of Philadelphia,* 248 Pa. 374, we said (p. 378) : "What the Constitution intended was to abolish the office of alderman, and all courts of inferior jurisdiction, and to substitute therefor and thereafter magistrates' courts having a similar jurisdiction and power." These Sections creating a civil division are therefore in direct violation of the Constitution. The drastic changes in the law introduced by them were not embodied in the original "1937 Magistrates' Court Act." They were added as an amendment to the bill apparently to supply a small claims' court.[6]

When the present act is analyzed, it is clear that the paramount legislative purpose is to correct evils exist-

---

[6] The bill (House Bill 1330) as originally introduced in the legislature on March 10, 1937, effected changes in criminal procedure and in the administrative functions of the magistrates' courts. The provisions (Sections 21 to 30 inclusive) for a civil division were inserted as an amendment to the original bill on April 13, 1937.

ing on the criminal side of these courts. Of the forty-seven Sections contained in the act there are but eleven relating solely to the civil jurisdiction of the magistrates. The fact that Sections creating a civil division may be subject to attack does not warrant the assumption that the legislature did not intend to adopt all these great reforms in their criminal practice advocated for so many years.

The provisions of the act relating to criminal law meet all the tests of severability. They are workable in themselves and can be put into effect regardless of the Sections dealing with civil jurisdiction. There is, in fact, such a line of demarcation between the criminal and the civil enactments that is not fair to say that the two are interwoven or interrelated, and that the one cannot exist without the other. The situation here is clearly different from that found in the Family Court Act *(Com. ex rel. v. Sutton*, 327 Pa. 337) where it was not possible to separate the unconstitutional portions from the valid Sections of the act without doing violence to the clear legislative intent.

We are of opinion, therefore, that effect should be given to Section 45 of the present Act that "the provisions of this act shall be severable,"[7] and thereby salvage the Sections dealing with criminal procedure in the magistrates' courts.

We have said that where an act is the product of the study made by a commission of citizens appointed to investigate conditions found to be harmful, and authorized to draft an act to eradicate such evils, the act should not be condemned unless the breach of the fundamental law is so glaring that there is no escape: *Minsinger v. Rau*, 236 Pa. 327.

---

[7] At the same session of the legislature there was enacted the Statutory Construction Act of May 28, 1937 (Act No. 282), which in Section 55 provides generally the same rule of interpretation.

It is elementary that a statute may be in part constitutional and in part unconstitutional, and in the event that the various parts of the statute are independent of each other, that which is constitutional will prevail and that which is unconstitutional will be rejected: *Lea v. Bumm,* 83 Pa. 237; *Rothermel v. Meyerle,* 136 Pa. 250; *Booth & Flinn v. Miller,* 237 Pa. 297; *Miller v. Belmont Packing & Rubber Co.,* 268 Pa. 51. Particularly is this true when the act in question contains a "severability clause": *Com. ex rel. v. Snyder,* supra; *Bagley Co. Inc. v. Cameron,* 282 Pa. 84; *Com. ex rel. v. Humphrey,* 288 Pa. 280; *Com. v. Haldeman,* 288 Pa. 81; *Mazurek v. Farmers Mutual Fire Ins. Co.,* 320 Pa. 33. See also *Suermann v. Hadley,* 327 Pa. 190. In *Rothermel v. Meyerle,* supra, it was said, (p. 265): "The constitutional and the unconstitutional provisions may even be contained in the same section of the law, and yet be perfectly distinct and separable, so that the former may stand though the latter fall."

The test of severability may be stated in simple terms as follows: after the invalid portion of the act has been stricken out, whether that which remains is self-sustaining and is capable of separate enforcement without regard to that portion of the statute which has been cast aside. If this be true the statute should be sustained to the extent of that which remains.

Two Sections require separate consideration. Sections 33 and 34 might perhaps be read as applying to both the criminal and the civil features of the present act, but we think they can be sustained as relating to the criminal jurisdiction vested in the magistrates, and to the civil jurisdiction that was theretofore vested in them. Such civil jurisdiction was, of course, not taken from them by the ineffective Sections of the present act. To the extent that appeals lie from magistrates' courts to the Common Pleas by statute, or by certiorari pursuant to Article V Section 10, or pursuant to Article V Section 14 of the Constitution of this Common-

wealth, or otherwise, the courts of Common Pleas, having such appellate jurisdiction, may be authorized to make rules of practice if the Board of Magistrates does not make them. The Common Pleas can not be vested with power to make rules of practice governing matters concerning which magistrates are required to make returns to the Quarter Sessions court, and we must assume and so hold, that the legislature did not intend to confer such power.

With reference to Section 34, the legislature is not empowered by the Constitution to subject the exercise of the jurisdiction conferred upon the magistrates to the visitorial power of the Common Pleas courts. We assume that the phraseology of Section 34 is not intended to bestow such power, but the legislative intention is to provide for such investigation as would enable a majority of the judges of the court of Common Pleas to exercise the powers conferred in Section 33 to approve the rules of practice made by the Board of Magistrates, or, in default of such rules, to enable the majority of the judges of the courts of Common Pleas to make them. So considered it is our opinion that Sections 33 and 34 may be sustained. If at a future time any particular action is challenged as not being within the terms of these Sections, this court may then deal with such question in the particular circumstances then presented.

The functions of the magistrates' courts come closer to the great mass of our population than any other part of our judicial machinery. The faith and respect of the citizens in the competency and integrity of these tribunals in which they appear must be maintained. These are the courts to which the ordinary citizen for relatively small but to him important problems, whether criminal or civil, resorts for the redress of his grievances. Competent and honest the magistrate can be a protector against both unlawful invasion of private rights by public officers, and the wrongdoing of crim-

inals and racketeers. Dishonest or incompetent, the magistrate becomes the tool of oppression and the ally of crime.

The reforms contemplated by this act, the most important since the institution of the system of magistrates' courts over sixty years ago, should be salvaged in furtherance of the administration of justice. The Sections in which they are contained are inherently independent of the invalid ones. The invalid provisions may be severed from the remaining part of the act. The valid Sections standing alone constitute a proper exercise of legislative power to prescribe criminal procedure and administrative reforms in these courts.

The bill of complaint in the present proceeding seeks to restrain the City of Philadelphia and various officials named as defendants from carrying into effect the provisions of the Act, and to have the statute declared unconstitutional. The decree entered in the court below sustained the validity of the Act and dismissed the bill.

The decree of the court below is modified, and the record is remitted with instructions to enter a decree not inconsistent with this opinion, costs to be equally divided between appellants and appellees.