Hallmark Productions, Inc. *v.* Carroll, Appellant.

Argued January 6, 1956. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO AND ARNOLD, JJ.

*Lois Forer,* Deputy Attorney General, with her *Elmer T. Bolla, Abraham J. Levy,* Special Deputy Attorney General, *Harry Stambaugh,* Special Deputy Attor-

ney General and *Herbert B. Cohen,* Attorney General, for appellant.

*Edwin P. Rome,* for appellee.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, March 13, 1956:

Hallmark Productions, Inc., submitted to the Pennsylvania State Board of Censors for approval a motion picture film which presented the story of a dope peddler and the manner in which he enticed innocent people in the use and sale of marijuana cigarettes. The Board concluded that the film was "indecent and immoral and, in the judgment of the Board, tended to debase and corrupt morals," and therefore disapproved it. Court of Common Pleas No. 2 of Philadelphia County reversed the order of the Board and the latter now appeals from that reversal.

No question is here raised as to the merits or demerits of the film or whether the Board of Censors was guilty of an abuse of discretion in refusing to issue a certificate of approval. The sole issue presented is whether the Motion Picture Censorship Act of May 15, 1915, P.L. 534, as amended by the Act of May 8, 1929, P.L. 1655, is unconstitutional, either because it is so vague and indefinite in its terms as to offend the due process clause of the Fourteenth Amendment, or because it abridges freedom of speech in contravention of the First and Fourteenth Amendments to the Constitution of the United States and the free communication of thoughts and opinions in violation of Article I, §7, of the Constitution of Pennsylvania.

The censorship of motion picture films in this Commonwealth goes back almost to the inception of the industry. The 1915 Act, as amended, provides (§6) that "The board [of censors] shall examine or supervise the

examinations of all films, reels, or views to be exhibited or used in Pennsylvania; and shall approve such films, reels, or views which are moral and proper; and shall disapprove such as are sacrilegious, obscene, indecent, or immoral, or such as tend, in the judgment of the board, to debase or corrupt morals." From any elimination or disapproval of a film, reel, or view ordered by the board there is given a right of appeal to the Court of Common Pleas of the proper county.

A New York statute provided for the banning of a motion picture film if it or a part thereof was "obscene, indecent, immoral, inhuman, sacrilegious, or of such a character that its exhibition would tend to corrupt morals or incite to crime." The New York State Board of Regents determined that a certain film examined by them was "sacrilegious" and ordered a rescission of the license to exhibit it which had been previously given. An affirmation of that order by the New York Court of Appeals was reversed by the Supreme Court of the United States: *Joseph Burstyn, Inc. v. Wilson, Commissioner of Education of New York,* 343 U.S. 495. The appellant there argued that the statute was a violation of the right of free speech, and also that the term "sacrilegious" was so vague and indefinite as to constitute a denial of due process. The court held (p. 502) that "expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments," but hastened to add (pp. 502, 503) that "It does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places. . . Nor does it follow that motion pictures are necessarily subject to the precise rules governing any other particular method of expression." While the Court stated (p. 503) that "This Court recognized many years ago that . . . a previous restraint is a form

of infringement upon freedom of expression to be especially condemned," it apparently did not base its decision on that ground but on the conclusion that the term "sacrilegious" did not provide a sufficiently definite standard for the guidance of a censor and therefore vested in him an almost unlimited restraining control over motion pictures. The Court's opinion ends with the statement (pp. 505, 506) that "Since the term 'sacrilegious' is the sole standard under attack here, it is not necessary for us to decide, for example, whether a state may censor motion pictures under a clearly drawn statute designed and applied to prevent the showing of obscene films. That is a very different question from the one now before us. We hold only that under the First and Fourteenth Amendments a state may not ban a film on the basis of a censor's conclusion that it is 'sacrilegious.'" In a concurring opinion Mr. Justice REED emphasized this limited scope of the decision by saying (pp. 506, 507) "Assuming that a state may establish a system for the licensing of motion pictures, *an issue not foreclosed by the Court's opinion,* our duty requires us to examine the facts of the refusal of a license in each case to determine whether the principles of the First Amendment have been honored."

In *Gelling v. State,* 157 Tex. Cr. Rep. 516, 247 S.W. 2d 95, an ordinance was held to be constitutional which authorized a local board of censors to refuse permission for the exhibition of a motion picture when, in the opinion of the board, it was "of such character as to be prejudicial to the best interests of the people of said city." On appeal to the Supreme Court of the United States the judgment was reversed (*Gelling v. Texas,* 343 U.S. 960) per curiam, citing the *Burstyn* case, 343 U.S. 495, and *Winters v. New York,* 333 U.S. 507. Mr. Justice FRANKFURTER, concurring, stated that in his opinion the ordinance offended the Due Process Clause

of the Fourteenth Amendment on the score of indef-
initeness, but Mr. Justice DOUGLAS, also concurring,
went further and condemned the evil of prior restraint
in general as a violation of the First Amendment.

In *Superior Films, Inc. v. Department of Education,
Division of Film Censorship*, 159 Ohio St. 315, 112 N.E.
2d 311, a statute of Ohio provided that "Only such films
as are in the judgment and discretion of the board of
censors of a moral, educational or amusing and harm-
less character shall be passed and approved by such
board." The Supreme Court of the State, after analyz-
ing the opinion and decision in the *Burstyn* case, con-
cluded (pp. 327, 328, N.E. p. 318) that "although a
motion picture film may not be rejected because of
'sacrilegious' expressions or portrayals, there still re-
mains a limited field in which decency and morals may
be protected from the impact of an offending motion pic-
ture film by prior restraint under proper criteria. . .
As we view it, the United States Supreme Court has not
*ipso facto* taken away all community control of moving
pictures by censorship, and this court will not do so
under the claim of complete unconstitutionality of cen-
sorship laws." The court held that while the criteria
by which films were to be judged under the terms of the
statute could doubtless have been made more definite
their connotation was sufficiently clear to permit of
their valid enforcement.

In *Commercial Pictures Corporation v. Board of Re-
gents of University of State of New York*, 305 N.Y. 336,
113 N.E. 2d 502, the Court of Appeals of New York had
before it for consideration the same statute of the State
as was involved in the *Burstyn* case. A picture had
been rejected by the authorities on the ground that it
was "immoral" and "would tend to corrupt morals."
The Court said (p. 346, N.E. p. 507) that "Viewing the
statute under consideration in its proper setting . . .

the words 'immoral' and 'tend to corrupt morals' as used therein relate to standards of sexual morality. As such they are not vague or indefinite. In this sense they are kindred to 'obscene' and 'indecent,' . . ." Accordingly the Court held that these terms provided a standard adequate to satisfy the requirements of due process, and it therefore affirmed the disapproval of the picture by the administrative body.

Both the *Superior Films, Inc.* case and the *Commercial Pictures Corporation* case were appealed to the Supreme Court of the United States and both were there reversed (346 U.S. 587) per curiam, citing merely the *Burstyn* case. Mr. Justice DOUGLAS, concurring in an opinion with which Mr. Justice BLACK agreed, stated that he could not accept the argument that the government might establish censorship over moving pictures, that it was inconceivable to him that plays for the theatre or for television could be pre-censored, and that (p. 589) "The same result in the case of motion pictures necessarily follows as a consequence of our holding in *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 502, that motion pictures are within the free speech and free press guaranty of the First and Fourteenth Amendments."

Following these decisions and pronouncements of the United States Supreme Court cases involving the same questions have arisen in various jurisdictions. In *RKO Radio Pictures, Inc. v. Department of Education of the State of Ohio, Division of Film Censorship,* 162 Ohio St. 263, 122 N.E. 2d 769, the court construed the decision of the United States Supreme Court in the *Superior Films, Inc.* case as an invalidation of the Ohio statute as a whole, and therefore held that no censorship under the act could be sustained. However, Chief Justice WEYGANDT dissented, saying (p. 269, N.E. p. 772) that "The basic difference of opinion among the

members of this court is whether the federal Supreme Court has in fact held the Ohio statutes unconstitutional. The conclusion of the majority seems to be that this has been done inferentially. It is the view of the minority that if, at a time when delinquency—both juvenile and adult—is a problem of unprecedented concern, the federal Supreme Court intends to hold that every film, no matter how obscene, profane, inflammatory or subversive can be shown, this is too serious a matter to be left to mere inference alone."

In *American Civil Liberties Union v. The City of Chicago*, 3 Ill. 2d 334, 121 N.E. 2d 585, an ordinance of the City of Chicago required the Commissioner of Police to issue permits for the exhibition of motion pictures unless he determined that they were "immoral or obscene" or had certain other objectionable qualities there enumerated. The Court, after reviewing and discussing the decisions of the United States Supreme Court hereinbefore referred to, concluded that they were not intended to invalidate all film censorship but were to be interpreted as holding merely that the standards employed in the statutes there under consideration were so broad or vaguely drawn as to sanction the suppression of some films which might not constitutionally be censored. The Court held that the term "obscene" had a sufficiently precise meaning to describe a class of films which the State might validly suppress. It further held that the term "immoral" in the ordinance must be construed as referring to that which is immoral because it is obscene, and accordingly determined that the Commissioner's refusal to issue a permit on the ground that the picture was "immoral and obscene" was not invalid on any ground of unconstitutionality or otherwise.

In *Brattle Films, Inc. v. Commissioner of Public Safety*, 333 Mass. 58, 127 N.E. 2d 891, there was pre-

sented to the Supreme Judicial Court of Massachusetts for consideration a statute of that Commonwealth which authorized the mayor of a city to grant a license to hold on the Lord's Day a public entertainment, provided, however, that no such license should have effect unless the proposed entertainment should have been approved in writing by the commissioner of public safety as being in keeping with the character of the day and not inconsistent with its due observance. The Court, reviewing the decisions of the United States Supreme Court previously referred to, held that the provision of the act in question was void on its face as a prior restraint on the freedom of speech and of the press guaranteed by the First and Fourteenth Amendments, and added that it was not necesary to determine whether it was also void for indefiniteness under the due process clause of the Fourteenth Amendment.

The latest case involving the question of the validity of these pre-censorship statutes is *Holmby Productions, Inc. v. Vaughn,* 177 Kan. 728, 282 P. 2d 412. There the Supreme Court of Kansas sustained an order of the State authorities disapproving the exhibition of a film under the authority of a statute which provided that the State Board of Review should approve such films as "are moral and proper; and shall disapprove such as are cruel, obscene, indecent or immoral, or such as tend to debase or corrupt morals." The Court declared (p. , P. 2d p. 414) that it was of opinion that the words "obscene, indecent, or immoral, or such as tend to debase or corrupt morals" were not so vague and indefinite as to offend due process, but that they had "an accepted, definite, and clear meaning." The Court cited the passage from the opinion in the *Burstyn* case in which the Supreme Court had stated that it was not deciding whether a State might censor motion pictures under a clearly drawn statute designed and applied to

prevent the showing of obscene films. Since the Board had given as one of its reasons for disapproving the picture that it was "obscene," the Court stated that they did not deem it necessary to define other words contained in the censorship statute. The order of the Board rejecting the picture was accordingly upheld. On appeal to the Supreme Court of the United States the judgment was reversed (350 U.S. 870) per curiam, citing the *Burstyn* and the *Superior Films* cases.

We have deemed it desirable thus to review the principal decisions of the State courts on the question here involved because they indicate that there exists a marked difference of viewpoint as to the exact import of the rulings of the Supreme Court of the United States in regard to the constitutionality of motion picture censorship statutes. What is clear is that the term "sacrilegious" in such a statute is so vague and indefinite in its connotation as to offend the due process clause of the Fourteenth Amendment (the *Burstyn* case, 343 U.S. 495); that authority given to a Board of Censors to refuse a permit if the picture be of such character as to be prejudicial to the best interests of the people is unconstitutional for the same reason (the *Gelling* case, 343 U.S. 960); that a provision that the picture must be of a "moral, educational or amusing or harmless character" is likewise void for indefiniteness (the *Superior Films* case, 346 U.S. 587); that authority to reject a picture on the ground that it is "immoral" and "would tend to corrupt morals" is similarly void (the *Commercial Pictures* case, 346 U.S. 587); and that a statute authorizing the disapproval of films that are "obscene or immoral" is void for the same reason (the *Holmby Productions* case, 350 U.S. 870). What remains uncertain—at least it has not definitely been decided by the Supreme Court—is whether all pre-censorship of motion picture films is unconstitutional as vio-

lating the right of free speech guaranteed by the First and Fourteenth Amendments to the federal Constitution.* While, as has been pointed out, the opinion in the *Burstyn* case categorically declared that expression by means of motion pictures was included within that guaranty, it was intimated, as hereinbefore stated, that motion pictures were not necessarily subject to the precise rules governing any other particular method of expression, and that it did not follow that the Constitution required absolute freedom to exhibit every motion picture of every kind at all times and at all places.

" Our Pennsylvania statute requires the disapproval of films which are ⁴sacrilegious, obscene, indecent, or immoral, or such as tend, in the judgment of the board, to debase or corrupt morals.⁾ The picture involved in the present case was disapproved by the Board of Censors because it was "indecent and immoral and, in the judgment of the Board, tended to debase and cor-

---

* There is also, perhaps, a question in regard to the "definiteness" of the particular term "obscene" and whether lewd or lascivious pictures might not, in any event, be held an exception to any general banning of censorship. In the *Burstyn* case this was expressly left undecided, and accordingly, in *American Civil Liberties Union v. The City of Chicago*, 3 Ill. 2d 334, 121 N.E. 2d 585, the Court decided that obscene films could properly be made subject to censorship. In *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-572, Mr. Justice Murphy had said that "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." However, in the *Holmby* case, 350 U.S. 870, the Supreme Court reversed the disapproval of a film as "obscene, indecent and immoral," the reasons given by the Kansas State Board of Review being: "Sex theme throughout, too frank bedroom dialogue; many sexy words; both dialogue and action have sex as their theme."

rupt morals.* In view of the foregoing decisions of the Supreme Court, individually and collectively, we are of opinion that these terms must be held subject to the same fatal objections as those which invalidated the statutes held unconstitutional by that Court. It is not necessary for us to consider whether constitutionality of our censorship statute might be effected by amendments that would make its terminology more definite and specific (assuming that greater definiteness is possible in the case of such abstract terms), or whether, however amended and "clearly drawn," any statute censoring motion pictures must be held to be unconstitutional on the theory that motion pictures are as much entitled to the protection of the constitutional guaranty of free speech as is now enjoyed by newspapers, magazines, books, theatrical exhibitions, radio and television scripts. It need hardly be added that even if all pre-censorship of motion picture films were to be held invalid this would not in and of itself affect the right to suppress objectionable films if exhibited, or to punish their exhibitor.

Order affirmed.

----

CONCURRING OPINION BY MR. JUSTICE BELL:

I would like to sustain the validity of Pennsylvania's Motion Picture Censorship Act of May 15, 1915, which prohibits the showing of motion pictures which are "obscene, indecent, immoral or sacrilegious," and which has protected the interests of the highly moral and deeply religious people of Pennsylvania for over 40 years. I believe such an Act to be wise, necessary and valid. However, the Supreme Court of the United States held in *Burstyn, Inc. v. Wilson*, 343 U.S. 495 that a censorship act which prohibits the showing of motion pictures which are "sacrilegious", establishes too vague

and indefinite a standard and consequently violates the constitutional guarantee of freedom of speech. Other decisions of that Court hold that similar statutes which prohibit pictures which are "obscene, indecent or immoral" lay down a standard which is too vague and indefinite and are therefore unconstitutional.* I believe the effect of these decisions of the Supreme Court of the United States is to invalidate motion picture censorship by State tribunals. Because of those decisions, I must reluctantly agree with the majority opinion.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Majority Opinion is an interesting legal travelogue but it does not decide the issue in this case. It takes the reader on a learned tour of various appellate courts but it does not resolve the appeal before us. The stark question which this litigation presents is a very simple one, namely, "Was the Pennsylvania State Board of Censors, under the law, justified in declining to inflict on the people of this State a monstrosity of a motion picture entitled, "She Should'a Said No!"? To this interrogation the Majority has not answered Yes, and it has not answered No.

Instead of rendering a decision on the proposition calling for a definitive adjudication, this Court has passed sentence of execution on an honorable institution which for forty-one years has protected the good people of Pennsylvania from sacrilegious, obscene, in-

---

* If that standard is too vague and indefinite before the motion picture is shown, it is difficult to understand how a Court can, after an exhibition, bar a picture or punish its participants on the ground that it is obscene, indecent, immoral or sacrilegious and hence a violation of Sections 527, 528 et seq. of The Penal Code of June 24, 1939, P.L. 872.

decent and immoral pictures and those tending to debase or corrupt morals. Without cause and, in my view, without law, this Court has struck down the Pennsylvania State Board of Censors and thus deprived the people of the assurance which should be theirs, that when they enter a motion picture theatre in this wholesome State of ours, they will not be subjected to such nauseants as "She Should'a Said No!"

The action of the Majority was gratuitous and uncalled-for. No situation called for a life-and-death decision on the Pennsylvania State Board of Censors, no imperative situation demanded the drastic sentence of doom, no dire circumstance dictated the demolition of a statutory barrier which for nearly a half century has been a dike, against which the black waves of indecency, immorality, and sacrilege have dashed in vain in their effort to break into the realm of innocent, harmless, and pleasureable entertainment in Pennsylvania.

The facts in the present litigation are as follows: On March 20, 1950, the State Board of Censors viewed a film entitled "Wild Weed," and rejected it as being immoral, indecent, not proper, and tending to corrupt and debase morals. The picture was resubmitted on January 24, 1951, with the title changed to "Devil's Weed." It was again rejected for the identical reasons specified the first time. The owners of the pictures now gave to the film the suggestive and odious title, "She Should'a Said No!" and presented it once more to the Board of Censors which detected no change in the odor of the film because of the alteration of name and accordingly refused, as theretofore, to give it a license for distribution.

With a persistence that might have been worthy of a more fragrant product, Hallmark Productions, owners of the picture, protested the Board's decision, and the Board once more re-viewed "She Should'a Said

No!", and once more declared it to be immoral, indecent, not proper and tending to corrupt and debase morals. On July 30, 1953, the Board filed an Adjudication enumerating 22 reasons why it regarded the film unfit for projection in Pennsylvania. It is my opinion that the Board was not only justified in refusing a certificate of license to Hallmark but that in conscience and the faithful fulfillment of its duties the Board could not have done otherwise. Five of the reasons taken from the Board's Adjudication convey a fairly good idea of the indecent and immoral character of "She Should'a Said No!", the film which the Majority of this Court, by its decision, has now allowed to be released for distribution: "FINDINGS OF FACT

"8. The scene of two teenage couples, an open roadster on a hill overlooking Hollywood and being under the influence of the drug; each boy having a girl in his arms and smoking a marijuana cigarette depicts depravity and indecency and is indecent and immoral and, in the judgment of the Board, tends to debase and corrupt morals and teaches a method of crime.

"10. The scene showing the party in Ann's home with Rita and the two men as they smoke marijuana cigarettes and under its influence deport themselves in an obscene manner is indecent and immoral and, in the judgment of the Board, tends to debase and corrupt morals.

"13. The scene showing Rita dancing in an indecent fashion under the influence of the drug after smoking a marijuana cigarette is indecent and immoral and, in the judgment of the Board, tends to debase and corrupt morals.

"14. The statement made by the dope peddler (Markey) is indecent and immoral and, in the judgment of the Board, tends to debase and corrupt morals,

when he says to the girl Ann 'ALL THAT ENERGY, BEAU-
TIFUL—LET'S NOT WASTE IT IN DANCING.'

"15. The scene where the dope peddler (Markey)
and Ann leave the room where the party has taken
place and where Ann has already smoked her first mari-
juana cigarette and goes into another room with Mar-
key is indecent and immoral and, in the judgment of
the Board, tends to debase and corrupt morals."

The owners of the picture argued that the film
serves a good purpose in depicting the evil results of
narcotics and that it therefore is a good preachment
against crime. The Board, however, saw no merit in
this contention: "The evils of drug traffic and addic-
tion shown as the theme of 'SHE SHOULD'A SAID No'
are not sufficient of themselves to prevent such crime,
or to discourage use of drugs, but rather in detailed
dialogue and action show the use of the 'weed' leading
to use of 'heroin, cocaine, opium' excites curiosity to-
ward escape from reality to teenagers, frustrated men
and women and weak characters, and actually leads
to lives of sin, corruption, horror and murder and is
indecent and immoral and, in the judgment of the
Board, tends to debase and corrupt morals."

Hallmark Productions appealed to the Court of
Common Pleas of Philadelphia County, alleging that
the action of the Board constituted a gross abuse of
discretion and that the Act of May 15, 1915, P. L. 534,
as amended by the Act of May 8, 1929, P. L. 1655, was
unconstitutional. The three judges of Court of Com-
mon Pleas No. 2, Judges LEWIS, CARROLL and SPORKIN,
viewed the picture. President Judge LEWIS heard wit-
nesses. Among the witnesses was J. M. Bransky, mem-
ber of the Federal Bureau of Narcotics, who was asked:
"Would your department feel that it would be safe in
this particular area, and in the area comprising the
Commonwealth of Pennsylvania, to give widespread

publicity and to disseminate information such as is contained in the moving picture of the character which we are considering at this point?" His answer was: "It is my judgment that the department would not." He was then asked: "You think it would be dangerous?" and his reply was a categorical, "Yes, sir."

It was shown further at the hearing that the film bore false colors in that it attempted to convey the impression that it had been produced under the advice and guidance of Federal authorities. The contrary is true. Mr. Bransky testified: "I made certain notes while the film was being shown, and the opening statement of the film, the film refers to help by the Government and narcotic officials. Of course, the Federal Bureau of Narcotics states that there was no aid furnished by the Federal Bureau of Narcotics in the preparation of this film."

Pointing out the dangerous potentialities of the film, Mr. Bransky said: "A scene was shown of a group of teenagers after smoking marijuana cigarettes going for an automobile ride, and one of the teenagers, one of the individuals—I wouldn't say teenagers—one of the individuals in the film makes a statement, 'I am on a great purple cloud.' This indicates the effects shown by smoking marijuana, and perhaps it arouses the curiosity of certain individuals, and I do not limit that to teenagers."

Mrs. Edna R. Carroll, who has been chairman of the State Board of Censors for 17 years, testified that in addition to Mr. Bransky, John H. Remig, Senior Medical Examiner of the Pennsylvania Division of Narcotic Control, Captain Driscoll, Lieutenant Kelly and Sergeant Levy of the Pennsylvania Police Narcotics Squad, Dr. Herr of the Methodist church, and a Catholic priest, the picture was viewed by many experts "one way or the other, either for narcotics or

their reaction towards the factors such a film would include, and they *unanimously* concluded that "it would be better not to give any publicity or disseminate it [the film] to the community."

The immediate reaction of Judges CARROLL and SPORKIN, when they viewed the film, was that it tends to debase and corrupt morals. Judge LEWIS was of the opinion that the picture "tends to make attractive to the young a vice, as shown in those scenes—these scenes that indicate the young people, if they smoke one of these cigarettes, become slap-happy, and they can just go to hell quickly, enjoying themselves on the way."

In spite of their apparent revulsion to the film, the Judges of the lower Court were of the opinion that the decision of the Supreme Court of the United States in *Burstyn v. Wilson,* 343 U.S. 495, was determinative of this case and they therefore reversed the order of the Board. They also declared the Pennsylvania Motion Picture Censorship Act to be unconstitutional.

This Court has now affirmed the decision of the Court of Common Pleas of Philadelphia County without discussing the nature of the film, which, of course, is the whirlpool of the litigation. The Majority says: "No question is here raised as to the merits or demerits of the film or whether the Board of Censors was guilty of an abuse of discretion in refusing to issue a certificate of approval. The sole issue presented is whether the Motion Picture Censorship Act . . . is unconstitutional." But it is impossible to decide the constitutionality of the Motion Picture Censorship Act without considering the motion picture which brought the Act into the forum of discussion. Statutes are not interpreted in a vacuum, they are not weighed abstractly, they are not appraised like a garment in a window— they must be draped over the living figure of the controversy. This Court cannot simply proclaim that a

solemn Act of the sovereign body of this Common-
wealth, the General Assembly, is unconstitutional. It
must specify why. This it has not done. It has not
advanced one reason why the Motion Picture Censor-
ship Act did not authorize the Board of Censors to dis-
approve the malodorous production entitled, "She
Should' a Said No!"

The decision of the Supreme Court of the United
States in *Burstyn v. Wilson*, in my judgment, is not
authority for the facts in the case before us. The
*Burstyn* case had to do with the projection of a motion
picture called "The Miracle," whose showing was
banned by the New York Board of Regents on the
ground that it was "sacrilegious." The Supreme Court
held that the word "sacrilegious" was vague and capa-
ble of too many interpretations to be a safe guide in
censoring films: "In seeking to apply the broad and all-
inclusive definition of 'sacrilegious' given by the New
York courts, the censor is set adrift upon a boundless
sea amid a myriad of conflicting currents of religious
views, with no charts but those provided by the most
vocal and powerful orthodoxies. New York cannot
vest such unlimited restraining control over motion pic-
tures in a censor. Under such a standard the most
careful and tolerant censor would find it virtually im-
possible to avoid favoring one religion over another,
and he would be subject to an inevitable tendency to
ban the expression of unpopular sentiments sacred to
a religious minority. Application of the 'sacrilegious'
test, in these or other respects, might raise substantial
questions under the First Amendment's guaranty of
separate church and state with freedom of worship for
all."

While conflicting currents of religious views might
make difficult the formation of a legal standard as to
what constitutes sacrilege in a motion picture, there

can be no conflict, in civilized society, as to what is indecent and immoral and what tends to debase and corrupt morals. The code of decency and morality is one that God laid down in the morning of creation and has been written on the tablets of conscience of every race since the mists of Genesis lifted, and man began to walk alone.

The Majority of this Court overlooks that the Supreme Court, in the *Burstyn* case, specifically pointed out: "Since the term 'sacrilegious' is the sole standard under attack here, it is not necessary for us to decide, for example, whether a state may censor motion pictures under a clearly drawn statute designed and applied to prevent the showing of obscene films. *That is a very different question from the one now before us.*"* And then so as to remove all possible doubt as to what was intended by the decision, the very last sentence in the Opinion of Justice CLARK, speaking for the majority of the Court, declares: "We hold *only* that under the First and Fourteenth Amendments a state may not ban a film on the basis of a censor's conclusion that it is 'sacrilegious.' "

The Majority of this Court refers to other decisions by the Supreme Court of the United States where other features of State censorship statutes were under consideration, but in those cases no Opinions were filed. I do not believe that the Supreme Court of the United States would expect this Court to strike down a Pennsylvania statute as unconstitutional only on an inference. Justice REED, concurring in the judgment of the Supreme Court in the *Burstyn* case, added this revelatory statement: "Assuming that a state may establish a system for the licensing of motion pictures, an issue not foreclosed by the Court's opinion, *our duty requires*

* Italics throughout, mine.

*us to examine the facts of the refusal of a license in
each case* to determine whether the principles of the
First Amendment have been honored. *This film* does
not seem to me to be of a character that the First
Amendment permits a state to exclude from public
view."

The Supreme Court also said in the *Burstyn* case
that: "It does not follow that the Constitution requires
absolute freedom to exhibit every motion picture of
every kind at all times and at all places . . . Nor does
it follow that motion pictures are necessarily subject
to the precise rules governing any other particular
method of expression." The Majority Opinion here
cites this quotation but declines to apply it to the situation
before us. So far as the Majority Opinion is concerned,
the vilest motion picture devised may not be
censored in Pennsylvania and it may not be kept out
of movie houses attended by children. This is indeed
a deplorable state of affairs and cannot be passed over
with a shrug of robed shoulders.

From time to time one reads in the daily press of
raids and arrests made in private clubs because of the
showing of lewd, immoral pictures. After the decision
of the Majority will have been handed down, those same
shameful, shameless, degrading films may be projected
anywhere in Pennsylvania publicly, the distributors
and exhibitors being subject only, *after the showing*,
to the penalty provided under criminal law. In the
meantime, however, grievous harm will have been done.
At the hearing before Judge LEWIS, the following significant
colloquy occurred between the attorney for
Hallmark and the Court: "The Court: Well, you have
to examine it [the film] sometime or other... Do you
mean to show it first, and then censor it? Mr. Rome:
If it is shown and it is sexually immoral, then the person
son showing the film may be brought in under the crim-

inal laws. The Court: Do you mean we should allow the ruination of our children and then give him 60 days in jail for it?"

How will the punishment of the exhibitor heal the lacerating wounds made in the delicate sensations of children and sensitive adults who witness a picture of lewdness, depravity and immorality? Damage is done at the very first exhibition of the film. There are theatres in Pittsburgh and Philadelphia which accommodate as many as 4,000 patrons for one show. If a picture should last but one day, many thousands would nevertheless have seen it by the time it is withdrawn from circulation. That is why reason dictates that control over immoral films must be found in prevention and not in subsequent punishment.

If a picture is clearly indecent, offensive and injurious to the morals and welfare of the public, there can be no doubt that the proper authorities could seek an injunction in a court of equity against the nuisance, thus preventing harm from being done rather than waiting merely to punish after damage has already been accomplished. The net result of the action of the Board of Censors, sitting as a tribunal of inquiry and review, is, therefore, to enjoin a nuisance. Thus, there can be no legitimate complaint that owners and distributors of questionable films are being denied due process of law, especially in view of the fact that appeals to the courts are always in order.

It is no answer to a demand for motion picture censorship to say that if the people do not like a film they can stay away. How are people to know if a certain production is immoral and indecent? And why should anyone be required to be offended in a theatre with scenes that sting decent eyes and with language that shocks respectable ears? If one is to learn of impurities in water only after he has drunk it, the munici-

pal authorities have done very little to protect the citizens who make up and maintain the municipality.

There is a very fallacious notion afloat on the waves of idle thought that in a free society, the least control makes for the greatest happiness. The slightest reflection will demonstrate that there would be considerable misery, not to say plagues and pestilences, if government did not hold an analytical and punitive eye over producers of medicines, drugs, foods and beverages and did not supervise the tillers in the fields of sanitation, hygiene and therapeutics. A good citizen not only does not object but is happy for the fact that someone far more skilled than he determines whether the can of peaches he opens or the box of pills he obtains at the drug store is free of poisonous and deleterious ingredients. A worthy member of society, who is just as much concerned about mental purity as he is over bodily cleanliness, is grateful that the government which protects him from contact with physical contagion will also save him from association with moral trash and garbage. No one can sensibly object to the regulation by municipal authorities over the use of public highways, parks, streams, tunnels and buildings. The streets of a city cannot be used for immoral purposes. Why should the avenues of the mind and the soul be polluted with the parading of indecencies and obscenities which can and do sometimes appear in films?

The motion picture industry, made up of responsible companies which have, over the years, earned the respect and the admiration of the American public, is aware of the need for decency on the screen. These companies have of their own volition agreed upon a Production Code which contains such excellent precepts as the following: "Motion picture producers recognize the high trust and confidence which have been placed in them by the people of the world and which

have made motion pictures a universal form of entertainment.

"They recognize their responsibility to the public because of this trust and because entertainment and art are important influences in the life of a nation.

"Hence, though regarding motion pictures primarily as entertainment without any explicit purpose of teaching or propaganda, they know that the motion picture within its own field of entertainment may be directly responsible for spiritual or moral progress, for higher types of social life, and for much correct thinking.

"So correct entertainment raises the whole standard of a nation.

"*Wrong entertainment lowers the whole living conditions and moral ideals of a race.*

"Art can be morally evil in its effects. This is the case clearly enough with unclean art, indecent books, suggestive drama. The effect on the lives of men and women is obvious.

"In the case of the motion pictures, this effect may be particularly emphasized because no art has so quick and so widespread an appeal to the masses. It has become in an incredibly short period the art of the multitudes."

Our Pennsylvania Board of Censors views over a thousand pictures a year. In 1953 it passed on 1144 subjects. It rejected 10 pictures outrightly and in 34 others eliminated 84 scenes. Who can say that he has lost any of his freedom because he was not given the opportunity to see the 10 bad pictures and the 84 outlawed scenes? The virtue in rejection does not lie alone in the discarding of what is improper but in the maintenance of a standard of decency and morality which assures each year the manufacture of less and less undesirable films. But with the elimination of

censorship, the light in the lamps of standardized correctness dims, and, as a consequence, there will not be lacking producers who will be guided only by the beacon of profit which can hardly be depended upon to keep the course of the ship of production travelling within pure waters.

The Motion Picture Censorship Act provides that: "The board [of censors] shall examine or supervise the examinations of all films, reels, or views to be exhibited or used in Pennsylvania; and shall approve such films, reels, or views which are moral and proper; and shall disapprove such as are sacrilegious, obscene, indecent, or immoral, or such as tend, in the judgment of the board, to debase or corrupt morals." The Supreme Court has decided in the *Burstyn* case, as I have already stated, that the word "sacrilegious" is vague and, therefore, in itself does not offer a sufficient criterion for the determination of what is harmful to the welfare of the people. However, there is nothing vague or uncertain about the words, "obscene," "indecent," and "immoral." There is nothing ambiguous about "debasement and corruption of morals." Any citizen with a fairly good education, excellent character, good religious upbringing, social consciousness and devotion to the ideals of democracy, can pass with satisfactory results on whether certain motion pictures are moral and proper. The Board is made up of three persons appointed by the Governor and confirmed by the State Senate, all of whom are charged by the Constitution with fidelity to the welfare of the Commonwealth. Competence and reliability in the board members can, therefore, fairly be assured. If, however, the Board should be unduly uncritical, one way or the other, in its appraisal of pictures, there is always an appeal to the courts for correction of error. It is thus inexplicable why this Court should deprive the people of the pro-

tection of motion picture censors, whose action can only be helpful and never hurtful to the people.

This Court could have said that, because of the decision in the *Burstyn* case, the Board may not disapprove any film on the ground that it is sacrilegious, but it should not have said and, as I see it, it cannot say, consistent with logic and law, that the Act is unconstitutional insofar as it empowers the Board to pass upon pictures under the criteria of decency and morality. The Statutory Construction Act of 1937, May 28, P. L. 1019, Art. IV, Sec. 55 (46 PS §555), provides that: "The provisions of every law shall be severable. If any provision of a law is found by a court of record to be unconstitutional and void, the remaining provisions of the law shall, nevertheless, remain valid, unless the court finds the valid provision, of the law are so essentially and inseparably connected with, and so depend upon, the void provision, that it cannot be presumed the Legislature would have enacted the remaining valid provisions without the void one; or unless the court finds the remaining valid provisions, standing alone, are incomplete or incapable of being executed in accordance with the legislative intent."

The Majority has in effect found that the Motion Picture Censorship Act is unconstitutional insofar as it appertains to the word "sacrilegious", but, as I have said more than once, the question of sacrilegiousness is not in this case at all. Why then does the Majority outlaw the provisions of the Act which *are* constitutional? We said in *Rutenberg v. Philadelphia*, 329 Pa. 26, 39, that: "It is elementary that a statute may be in part constitutional and in part unconstitutional, and in the event that the various parts of the statute are independent of each other, that which is constitutional will prevail and that which is unconstitutional will be rejected . . . In Rothermel v. Meyerle, supra, it was said,

(p. 265) : 'The constitutional and the unconstitutional provisions may even be contained in the same section of the law, and yet be perfectly distinct and separable, so that the former may stand though the latter falls.' "

By striking out the word "sacrilege," the Motion Picture Censorship Act would read in its relevant part: "[The Board] shall disapprove such [films] as are obscene, indecent, or immoral, or such as tend, in the judgment of the board, to debase or corrupt morals." There can be no question that as so stated the law would and could be intelligently and easily enforced. The standards of what constitutes indecency and immorality are not so inextricably interwoven with those of sacrilegiousness that they cannot stand alone. We said further in the *Rutenberg* case: "The test of severability may be stated in simple terms as follows: after the invalid portion of the act has been stricken out, whether that which remains is self-sustaining and is capable of separate enforcement without regard to that portion of the statute which has been cast aside. If this be true the statute should be sustained to the extent of that which remains."

The Pennsylvania Motion Picture Censorship Act is a fortress, armed originally with five cannon to protect the welfare of the people from the forces of immorality and intemperate greed. One of the cannon has been ruled out of action. The other four remain whole and strong and are in excellent firing condition. History has never shown in America a surrender, while artillery of this formidableness was fighting on the side of the right.

With this dissent I serve notice that I oppose hauling down the Flag.